IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONAL ASSOCIATION OF ) <br> GOVERNMENT EMPLOYEES, INC., ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **JANET YELLEN**, Secretary of Treasury, ) <br> in her official capacity, and ) <br> **JOSEPH BIDEN**, President of the United ) <br> States, in his official capacity ) <br> ) <br> **Defendants.** ) | Civil Action No.: 1:23-cv-11001-RGS |

**MOTION AND MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff, National Association of Government Employees, Inc. ("NAGE"), by and through its undersigned counsel, hereby moves this Court on an emergency basis for an Order of Preliminary Injunction declaring the Debt Limit Statute, 31 U.S.C. 3101(b), in violation of the separation of powers and the Presentment Clause as set forth in Articles I and II of the United States Constitution, and enjoining Defendant Janet Yellen, in her capacity as United States Secretary of the Treasury, from limiting the borrowing of the United States pursuant to the Debt Limit Statute.

**PRELIMINARY STATEMENT**

Plaintiff, on behalf of its members, seeks to bar Defendants from suspending, cancelling, or delaying any salary due to its members and investments in their retirement and savings plans, for the purpose of complying with the $31.4 billion limit on the national debt set by 31 U.S.C. 3101(b). Plaintiff seeks such relief on the grounds that 31 U.S.C. 3101(b) in its present form is in violation of the separation of powers as set forth in Articles I and II of the United States

Constitution, and both Plaintiff NAGE as a labor organization and its members will suffer irreparable injury without emergency injunctive relief. Plaintiff seeks an order removing any limit to the borrowing authority of Defendant Yellen until Congress revises 31 U.S.C. 3101(b) such that it no longer violates the separation of powers.

The Debt Limit Statute is unconstitutional on two grounds:

(1) As currently written, 31 U.S.C. 3101(b) effectively requires the President to use a stealth version of a line-item veto over spending that Congress has previously approved. This version of a line-item veto is even more unguided and unlawful than the express grant of such a line-item veto under the Line Item Veto Act, 2 U.S.C. § 691 *et seq.*, that the United States Supreme Court struck down in *Clinton v. New York,* 524 U.S. 417 (1998). Here, as with the Line Item Veto Act in *Clinton,* 31 U.S.C. 3101(b) forces the President to make spending cuts that Congress knew would be necessary – here, to comply with its own debt limit - but lacked the political will to make itself. Presumably, Congress included this provision to avoid the constitutional problems that would arise under the Fourteenth Amendment if 31 U.S.C. 3101(b) contemplated and caused a willful default on the national debt in the event that the debt limit is reached. As stated in *Clinton,* and consistent with the prescribed "finely wrought" procedure in Article I for enacting or repealing or amending the law, only Congress can make a reduction in the fiscal year spending that it has previously approved.

(2) Even if *Clinton* were not controlling, and even if 31 U.S.C. 3101(b) was not enacted with the purpose of forcing the executive to make spending cuts that only the legislature can make, 31 USC 3101(b) is still unconstitutional and in violation of the separation of powers because Congress has not clearly authorized what actions Defendants should undertake, or what priority of payments Defendants should follow, when the United States runs out of cash to pay its

bills.  For that reason, at the very least, 31 U.S.C. 3101(b) is unconstitutional in its present form until Congress so revises it to clearly authorize the major actions that the Defendants must now undertake.

Plaintiff NAGE, in its associational capacity, has standing to challenge 31 U.S.C. 3101(b) as a violation of the separation of powers because its members have experienced and will experience the following concrete actual and imminent injuries:

(1) *Suspension of investments.* To avoid a breach of the debt limit set by 31 U.S.C. 3101(b), Defendant Yellen, on January 13, 2023, declared a debt limit suspension period pursuant to 5 U.S.C. 8348(j). Under that provision, Defendant Yellen has withheld new investments and reinvestments in the retirement and thrift saving plans of NAGE members to meet other obligations of the United States and to avoid exceeding the statutory limit on the national debt.  In doing so, Defendant has diminished the assets in the Civil Service Retirement and Disability Fund (CSRDF), and other savings plans set up for the benefit of Plaintiff's members and other federal employees.

(2) *Delay in federal paychecks.*  All members' and all other federal employees' regular paychecks will be delayed once the United States runs out of cash.

(3) *Other financial losses to CSRDF and related plans.* Defendant Yellen has predicted that a financial crisis will occur when the United States runs out of cash, and that crisis will inflict further loss on the invested value of the assets in the CSRDF and related plans.

Plaintiff's members face irreparable injury from such actions that will affect all of its members. Indeed, even 5 U.S.C. 8348, the statute pursuant to which Defendant Yellen suspended investments in the CSRDF, recognizes that reimbursement to the CSDRF at the end of the debt limit suspension period can only be an approximation of the present value of the amount

withheld.  Nor is it possible to redress the injury and distress from the delay in paychecks to NAGE members and their families and other losses in the invested value of the CSDRF and other plans in which they are participants when the catastrophe predicted by Defendant Yellen occurs. Moreover, Plaintiff itself will suffer a loss of income from member dues when its members are furloughed and no longer receive their salaries.

## BACKGROUND

On December 16, 2021, to avoid an imminent default on the public debt, Congress raised the debt limit – the limit on borrowing by the United States – by $2.5 trillion to the present level of $31.4 trillion by enacting Public Law 117-73.  In fiscal year 2022, Congress approved a budget that incurred a deficit of $1.4 trillion.  For fiscal year 2023, which ends on September 30, 2023, Congress approved a budget that will incur a deficit of more than $1.5 trillion.  *See An Update to the Budget Outlook: 2023 to 2033*, Congressional Budget Office (May 12, 2023), https://www.cbo.gov/publication/59096. It has been widely known and recognized that, upon enactment of the fiscal year 2023 budget, Congress will have caused a breach in the debt limit that Congress itself set in December 2021.

On January 13, 2023, Defendant Yellen sent a letter to Congress advising it that the United States government would reach the debt limit of $31.4 trillion established by the Debt Limit Statute by early June 2023.  *See Debt Limit Letter to Congress 1/13/2022*, (Jan. 12, 2023), https://home.treasury.gov/system/files/136/Debt-Limit-Letter-to-Congress-McCarthy-20230113.pdf.  The deadline in early June was contingent on Defendant Yellen taking extraordinary measures starting on January 19, 2023, *inter alia*, to continue paying the government's public debt, fund government programs, and pay federal employees.  *Id.*  As noted above, pursuant to 5 U.S.C. 8348(j), which governs the CSRDF, Defendant Yellen declared a "debt issuance suspension period" and thereafter halted investments and reinvestments into the

4

CSRDF and the Thrift Savings Plan's G Fund and has used such savings to provide cash for meeting other obligations of the United States. These actions include redeeming existing and suspending new investments in the CSRDF, in which Plaintiff's members are participants, as well as the Postal Health Fund. Defendant Yellen also suspended reinvestment of the Thrift Savings Plan's G Fund, in which some of Plaintiff's members are participants as identified by government records.

The debt issuance suspension period continues in effect and continues to diminish the value of the assets of the benefit plans of the CSDRF and Thrift Savings Plans in which Plaintiff's members are participants. While Defendant Yellen is required by 5 U.S.C. 8348 to make good on these losses when the debt issuance suspension period ends, there is presently no end in sight or increase in the debt ceiling, and the retirement plans continue to lose value.

Nevertheless, despite these extraordinary measures, which have already irreparably harmed Plaintiff's members, the United States will soon run out of cash to pay its bills. The Congressional Budget Office has estimated that the gap between the debt limit and the spending authorized by Congress is likely to be between $0.3 trillion and $0.6 trillion by the end of the fiscal year on September 30, 2023. A serious debt ceiling impasse occurred in 2011 during the administration of President Barack Obama. At that time, a contingency plan was established to prioritize the payment of interest and principal on the debt, as set forth in the Federal Reserve Board minutes attached as Exhibit A. *See FOMC Conference Call Transcript, August 1, 2011*, (Dec. 27, 2016), https://www.federalreserve.gov/monetarypolicy/files/FOMC20110801confcall.pdf.

Defendant Yellen has stated that the impact of a default on the American economy today would be "catastrophic." *See* Zinya Salfiti, *Treasury Secretary Janet Yellen is warning CEOs*

5

*about the potentially "catastrophic" fallout from a US debt default*, Business Insider (May 9, 2023), https://markets.businessinsider.com/news/stocks/treasury-secretary-janet-yellen-warning-ceo-catastrophe-us-debt-default-2023-5?op=1.

Accordingly, economists have concluded that the Treasury would likely follow the "contours of that plan" of the Federal Reserve that was established during the Obama administration in 2011 and pay Treasury securities as they come due. As for everything else, "[T]reasury would delay payments for all other obligations until it had at least enough cash to pay a full day's obligations." *See* Wendy Edelberg and Louise Sheiner, *How worried should we be if the debt ceiling isn't lifted?*, (April 24, 2023), The Brookings Institute, (https://www.brookings.edu/2023/04/24/how-worried-should-we-be-if-the-debt-ceiling-isnt-lifted/). Thus, Treasury will delay federal paychecks, as well as payments to agencies, contractors, Social Security beneficiaries, and Medicare providers, rather than attempting to pick and choose which payments to make that are due on a given day. *Id.*

## ARGUMENT

### A) PLAINTIFF HAS STANDING TO CHALLENGE THE DEBT LIMIT STATUTE AS A SEPARATION OF POWERS VIOLATION.

Plaintiff has a justiciable claim for relief in challenging 31 U.S.C. 3101(b) as a violation of the separation of powers. As the Supreme Court has often held, "whenever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen,* 141 S. Ct. 1761, 1780 (2021); *see also Seila Law v. Consumer Financial Protection Bureau,* 140 S. Ct. 2183, 2195–96 (2020) ("[W]e have expressly 'reject[ed]' the 'argument that consideration of the effect of a removal provision is not 'ripe' until that provision is actually used,' because when such a provision violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court.") (quoting

6

*Bowsher v. Synar*, 478 U.S. 714, 727, n.5 (1986)); *INS v Chadha,* 462 U.S. 919, 935–936 (1983) ("We must also reject the contention that Chadha lacks standing because a consequence of his prevailing will advance the interests of the Executive Branch in a separation of powers dispute with Congress, rather than simply Chadha's private interests."). "[T]he separation of powers is designed to preserve the liberty of all the people." *Collins,* 141 S. Ct. at 1880; *see also Clinton v. New York,* 524 U.S. 417, 449–50 (1998) (Kennedy, J. concurring) ("To say the political branches have a somewhat free hand to reallocate their own authority would seem to require acceptance of two premises: first, that the public good demands it, and second, that liberty is not at risk. … The latter premise … is flawed.  Liberty is always at stake when one or more of the branches seek to transgress the separation of powers."); *Bowsher,* 478 U.S. at 730 (1986) ("The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty.").

  Plaintiff has standing to bring this action on behalf of its members who would otherwise have standing to sue in their own right. Further, the interests are germane to NAGE's purpose of representing its members' interests, and "neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs., Inc.,* 528 U.S. 167, 181 (2000) (citing *Hunt* v. *Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977)). In this case, there are at least three types of injury that Plaintiff's members will suffer equally and that raise no individual issues.  First, Defendant Yellen has declared a debt issuance suspension period pursuant to 5 U.S.C. 8348(j) and has suspended investments and re-investments in the CSDRF and the Thrift Savings Plan's G Fund. Defendant Yellen's actions have diminished the invested value of these plans, which are for the benefit of their participants, many of whom are members of Plaintiff NAGE. It is true that

Defendant Yellen is required at the end of the debt issuance suspension period to make good on these losses by reimbursing withheld funds, but (1) 5 U.S.C. 8348 itself recognizes that any such reimbursement only can be an approximation and cannot fully redress lost investment opportunities, and (2) in any case the debt issuance suspension period has no prospect of ending unless and until Congress takes legislative action which may or may not lead to redress. Regardless, there is no need for the debt issuance suspension period and consequent injury to the Plaintiff's members if 31 U.SC. 3101(b) itself has been and is unconstitutional in its present form.

Aside from this actual injury, Plaintiff's members face certain and imminent harm when the United States runs out of cash to pay its bills. Although individual members may or may not be furloughed, and there will be different degrees of individual injury from layoffs, all of Plaintiff's members face an imminent and certain injury from delay in their paychecks, whether for days, weeks, or months. *See* Declaration of Lee Sutton, ¶ 7.

In addition, apart from the actual injury already suffered to Plaintiff's members' plans from the debt issuance limitation period, these plans will suffer additional losses when the economic calamity predicted by Defendant Yellen occurs. Indeed, there is no legal obligation at all that Defendant Yellen or the United States reimburse losses to the CSRDF or Thrift Savings Plan's G Fund once the United States runs out of cash or defaults on its debt, and financial panic occurs.

Furthermore, Plaintiff NAGE, as a labor organization, will suffer injury directly from the delay and/or loss of member dues because the layoff, furlough, or work without pay of some, if not all members is imminent and certain, and Plaintiff will no longer receive such dues from its members' automatic payroll deductions. *See* Declaration of Lee Sutton, ¶ 6.

Under Article III, Plaintiff, on behalf of its members, can show that it has suffered an "injury in fact" to its members. That injury is "fairly traceable" and a result of a statute that is unconstitutional, in violation of the separation of powers. That injury would likely be "redressed by a favorable decision" suspending 31 U.S.C. 3101(b), even temporarily, unless and until it can be properly revised. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (internal quotes omitted).

**B)   PLAINTIFF SATISFIES THE FOUR PREREQUISITES FOR PRELIMINARY INJUNCTIVE RELIEF.**

Plaintiff can satisfy the four perquisites for preliminary injunctive relief by establishing "'that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *ACA International v. Healey*, Civil Action No. 20-10767-RGS, 2020 WL 2198366, at *23 (D. Mass. May 6, 2020) (quoting *Voice of the Arab World, Inc. v. MDTV Med. New Now, Inc*., 645 F.3d 26, 32 (1st Cir. 2011), quoting *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008)).

The First Circuit has long held that "likelihood of success is the main bearing wall of the four factor framework." *Ross-Simmons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 16 (1st Cir. 1996). Supreme Court precedent firmly establishes that, once Congress has enacted legislation that has been signed by the President, nothing in either Article I or Article II of the U.S. Constitution authorizes the President or the Executive Branch to repeal, amend, or cancel all or parts of such "duly enacted statutes." *Clinton*, 524 U.S. at 439. Yet that is what 31 U.S.C. 3101(b) requires – that the Defendants cancel parts of the budget approved by Congress or delay payment until such authority expires on September 30, 2023, and an effective rescission occurs. This Court must presume such intent, as the alternative is to default on the obligations to holders

9

of the debt of the United States.  Such an intent, which is not evident on the face of the statute, would raise significant constitutional issues under the Fourteenth Amendment and should therefore not be deemed to be the intent of Congress by this Court.  *See Perry v. United States*, 294 U.S. 330, 354 (1935) (recognizing the "fundamental principle" that "validity of the public debt . . . shall not be questioned").  Accordingly, the only alternative to defaulting on the public debt is for the Secretary and President to prioritize payment of the debt while eliminating other costs to free up the cash to do so.  That means cutting costs by furloughing and laying off government employees and stopping or delaying payments to federal employees, including their benefits and pensions, as well as on government programs like Social Security, Medicare, military service or contracts, veterans' benefits, and Supplemental Security Income.  The decisions by the Secretary and President, however, to continue some of the programs approved by Congress while modifying or cancelling others is a violation of the separation of powers that results in direct injury to members of Plaintiff NAGE as well as others who fail to receive payments for services performed or are recipients of programs and benefits duly enacted by Congress.

1. **<u>Success on the Merits</u>**

As often noted, 31 U.S.C. 3101(b) places Secretary Yellen as well as President Biden in an impossible position, both constitutionally and practically.  They are required to pay bondholders as payment on the public debt comes due *and* continue the spending that Congress has approved for federal programs *and* comply with the debt limit set by 31 U.S.C. 3101(b). [1]

---

[1]  *See* Neil H. Buchanan and Michael C. Dorf, "How to Choose the Least Unconstitutional Option: Lessons for the President (and Others) From the Debt Ceiling Standoff," 112 COLUM. L. REV. 1175, 1175 (2012) (noting that the executive branch has a "trilemma" of "three unconstitutional options: ignore the debt ceiling and unilaterally issue new bonds, thus usurping Congress's borrowing power; unilaterally raise taxes, thus usurping Congress's taxing power; or unilaterally cut spending, thus usurping Congress's spending power.")

10

Defendants cannot do all three things at once, and if it is assumed that Defendants prioritize payment to holders of government debt, as laid out in the contingency plan of the Obama Administration in 2011, Defendants also have no direction as to what programs to cut to ensure that holders of the debt will be paid.  Without any guidance from Congress, Defendants are left to decide what cuts in federal programs, including Social Security, Medicare, the Civil Service, or military spending, to make up the estimated shortfall of $0.3 trillion to $0.6 trillion by the end of this fiscal year.

Congress does not identify in 31 U.S.C. 3101(b) what approved spending the President and Secretary may cancel or rescind or even delay.  Nor does it authorize or indicate to the President the order of payments that the Secretary should make, whether to bondholders, Social Security, Medicare, veterans' beneficiaries, defense contractors, or federal employees. While the President may have discretionary authority in some cases to delay spending where Congress has included explicit direction in a statute, a delay or suspension for a short period of a few months is an effective rescission when the fiscal year ends on September 30, 2023.  It will be a cancellation, not a suspension, as deferral of spending cannot be proposed for any period of time beyond the end of the fiscal year.

For at least two reasons, Plaintiff will succeed in establishing a violation of the separation of powers under Articles I and II.

> a. *Consistent with the prescribed procedure for enacting law in Article I, section 7, Congress itself must make the specific reduction of spending that may be required by the limit on indebtedness.*

If it is assumed that Congress did not intend a willful default on the debt, the President will be required to cut or cancel spending approved by Congress to pay the interest and principal to holders of Treasury securities.  Whether immediately or shortly thereafter, 31 U.S.C. 3101(b) requires the President to use the *de facto* equivalent of a line-item veto to pay the holders of

11

government debt and to avoid further increases in government indebtedness. This stealth, under-the-radar grant of a line-item veto is unconstitutional for the same reasons that the United Supreme Court struck down the Line Item Veto Act's formal line-item veto in *Clinton*. As the Court made clear in *Clinton*, under Article I, Congress has exclusive power over taxation, spending, and borrowing. For that very reason, Congress may not formally transfer that power to the President to cancel or rescind spending once Congress has duly enacted a statute that has been signed into law by the President. It certainly may not do so here, implicitly, without taking even that much responsibility for the cancellation of its own laws. Congress cannot abdicate its law-making function in so irresponsible a way and leave it to the President to reorder in his discretion the entirety of federal spending. *See Clinton*, 524 U.S. at 452 ("one Congress cannot yield up its own powers, much less those of other Congresses to follow") (citations omitted) (Kennedy, concurring).

However, through 31 U.S.C. 3101(b), Congress is forcing the President to make spending reductions that Congress failed or lacked the will to make. Already near the debt limit, the last Congress adopted in the current fiscal year a budget that would require adding $1.5 trillion in debt ***without identifying or indicating any priority of payments once the limit on indebtedness was reached***. Congress then failed to raise the debt ceiling or increase taxes and effectively offloaded the dirty work of repealing parts of the spending that Congress itself had just approved.

In *Clinton*, the Court struck down a much more limited grant of a line-item veto which applied only to certain specific spending. The Court held that any Presidential revision of spending after it became law violated the limited role of the President under the Presentment Clause, Article I, section 7. Article I did not give the President authority for such a veto or

rescission.  The Court concluded: "Constitutional silence on this profoundly important issue is equivalent to an express prohibition." *Id.* at 439.

Nor did it matter in *Clinton* how formally the President canceled or amended the spending.  In dissent, Justices Breyer and Scalia argued that the line-item veto did not formally amend or repeal any Congressionally approved spending, leaving the formal law, as it was written, intact. *See id.* at 472 (Breyer and Scalia, J., dissenting).  The Court, however, focused not on the formality of the revision but on the "legal and practical effect" of the President's action. "In both legal and practical effect, the President has amended two acts of Congress." *Id.* at 437. The Court concluded:

> If the Line Item Veto were valid, it would authorize the President to create a different law—one whose text was not voted on by either House of Congress or presented to the President for signature.  Something that is known as 'Public Law 105-33 as modified by the President' may or may not be desirable, but it is surely not a document that may 'become a law' pursuant to the procedures designed by the Framers of Article I, § 7 of the Constitution.

*Id*. at 448–49. If Congress wants to give the President that kind of authority to rescind spending, the Court said, it would have to amend the Constitution.  *See id.* at 448.

In concurring, Justice Kennedy expressed concern over the size of the debt, which he described as putting the "Constitution and its survival in peril."  *Id.* at 449.  However, he wrote, "Failure of the political will does not justify unconstitutional remedies…. The Constitution's structure requires a stability which transcends the convenience of the moment." *Id*.

As the Court has often noted, passing legislation is no easy task. A specific appropriation must withstand the "finely wrought" procedure of bicameralism and presentment. *Chanda,* 462 U.S. at 951; *see also Clinton*, 524 U.S. at 540.  Within that process, there are many difficulties. The present case illustrates how difficult it is to enact legislation that either reduces spending or

raises taxes.  But that difficult process, designed by Article I, does not justify turning the spending power of Congress over to the President.

                b.        *When Congress has limited borrowing and required either default or rescission of spending, Congress itself must authorize the order of payment and may not lawfully leave such action to the President.*

As noted above, the President cannot concurrently pay the bondholders, carry out required spending, and comply with the debt limit. While Congress presumably intends for the President to cut spending, 31 U.S.C. 3101(b) is unconstitutional unless and until it is revised by Congress to authorize what action the President may undertake.  As in a bankruptcy-type proceeding, Congress must authorize or at least indicate the order of payments or how the President should sort out the conflicting obligations.  Congress cannot leave the President without *clear* authorization as to how to proceed.  In recent cases, the Supreme Court has held that Congress must clearly authorize the President's authority and has claimed to have created a "major questions" doctrine.  *See, e.g.*, *West Virginia v. EPA,* 142 S. Ct. 2587 (2022) (striking down EPA action to switch utilities from coal to renewables); *National Federation of Independent Business v. Department of Labor* 142 S. Ct. 66 (2022) (striking down mask mandate).  The Court has stated: "… in certain extraordinary cases, both separation of power principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *West Virginia,* 142 S. Ct. at 2609.

The converse of this principle is that Congress, in turn, without ambiguity, must give at least some indication as to what, in this case, the President can do.  But the Debt Limit Statute does not afford any clear authorization as to which of the conflicting obligations upon the President are to be pursued: whether to default or cancel spending, or what order of payments to

14

undertake. It is harder to think of a major question that is greater than this, and yet it is unclear what action or power Congress has delegated to the President to undertake.

As stated before, Plaintiff does not challenge the *principle* that Congress may limit the indebtedness of the United States or even require a default, notwithstanding the Fourteenth Amendment, and does not seek or ask this Court to resolve that controversial question. However, Plaintiff *does* seek an order suspending the debt limit of $31.4 trillion, unless and until Congress revises the statute (1) to identify and enact the cancellation or rescission of spending that is necessary in the absence of a default to meet the terms of the law, and (2) to otherwise identify and clearly authorize which of the conflicting obligations the President should follow and the order of payments to undertake.

This is a case of first impression, but this Court can take note that leading constitutional scholars, including Professor Michael Dorf and Professor Laurence Tribe, have reached similar conclusions about the constitutionality of the debt limit. *See* Michael C Dorf, *Litigating Debt Ceiling Plan B* (Jan. 19, 2022), http://www.dorfonlaw.org/2023/05/litigating-debt-ceiling-plan-b.html.; *see also* Christina Pazzanese, *Laurence Tribe explains how 14th Amendment can help Biden avoid default*, Harvard Gazette (May 15, 2023), https://news.harvard.edu/gazette/story/2023/05/laurence-tribe-explains-how-14th-amendment-can-help-biden-avoid-default/.

For the reasons discussed above, Plaintiff is likely to succeed on the merits.

2.      **Irreparable Injury**

Plaintiff and its members will suffer irreparable injury unless this Court allows Defendant Yellen to continue borrowing and suspend the application of 31 U.S.C. 3101(b) until Congress can cure its unconstitutional defect. There is no basis for the debt issuance suspension period if 31 U.S.C. 3101(b) itself is unenforceable. Under 5 U.S.C. 8348(j), any amounts not invested

shall be invested "as soon as such investments can be made without exceeding the public debt limit," but there is no legal remedy to ensure this will occur unless and until Congress acts by further legislation.  This is not just a matter of there being an inadequate legal remedy; here there no legal remedy.  In cases involving loss of money, Justice Scalia noted, "[m]orally the mere payment of money is not considered irreparable … but that is because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable." *Phillip Morris USA v. Scott,* 561 U.S. 1301 (2010); *see also* Douglas Laycock, *The Death of the Irreparable Injury Rule,* 103 HARV. L. REV. 687, 716 (1990) ("Damages are no remedy at all if they cannot be collected, and most courts sensibly conclude that a damage judgment against an insolvent defendant is an inadequate remedy."); *Chevron Corp v. Donziger,* 833 F.3d 74, 143 (2d Cir. 2016). There is no legal requirement that the losses will be recouped, but only that they can be recouped someday if doing so does not breach the limit on indebtedness.  The very purpose of the self-willed bankruptcy that Congress has imposed by virtue of 31 U.S.C. 3101(b) is to deprive or limit members of NAGE and other creditors of a legal remedy.

Nor can there be legal remedy for the distress and anxiety that will be felt by all members of NAGE from the delay and even uncertainty of receiving their paychecks which Defendants will have to hold up when the United States has run out of cash. Plaintiff's members and their families cannot live this way.  Nor can they seek compensation later for such harms.

Nor is there any legal remedy or hope of reimbursement for the harm that members of NAGE are likely to suffer in the value of the current assets in CSDRF and the Thrift Savings Plans when failure to suspend 31 U.S.C. 3101(b) as Plaintiff seeks leads to the financial market

calamity that Defendant Yellen predicts. There is no obligation of the federal government to redress these losses. This too is likely irreparable injury.

        **3.**      **The Public Interest and Balance of Hardships**

The balance of hardships favors a preliminary injunction because the harm to Plaintiff is irreparable, and there is no harm to the United States or any person or taxpayer in the United States if Defendant Yellen continues to borrow to meet the obligations of the United States and avoid a major financial panic. It may be that the relief sought here will increase the indebtedness of the United States by an amount between $0.3 trillion and $0.6 trillion, but the spike in interest rates for continued debt service over the years to come will dwarf this cost if 31 U.S.C. 3101(b) is not enjoined.

As to the public interest, it is always in the public interest to prevent the violation of a party's constitutional rights. *Gannett Co. Inc v. De Pasquale* 443 U.S. 368, 383 (1979). That is especially true when it is a violation of the principle of the separation of powers. The separation of powers protects the liberty interests of the people of the United States, at least as much as the Bill of Rights. *See Clinton,* 524 U.S. at 448 (Kennedy, J. concurring).

There is little Plaintiff can add to the repeated warnings by Defendant Yellen of the harm to the public if the limit set by 31 U.S.C. 3101(b) is not immediately suspended or raised.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court grant this emergency motion for a preliminary injunction suspending 31 USC 3101(b) during the pendency of this case and unless and until the statute can be revised to comply with Articles I and II of the Constitution.

Dated: May 19, 2023                                   Respectfully submitted,

NATIONAL ASSOCIATION OF
GOVERNMENT EMPLOYEES, INC.,

By its attorneys,

*/s/ Shannon Liss-Riordan*
Shannon Liss-Riordan, BBO #640716
Matthew P. Carrieri BBO #705192 Lichten
& Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com
mcarrieri@llrlaw.com

Sarah E. Suszczyk
*(Pro hac vice application forthcoming)*
General Counsel NAGE/IBPO/IAEP/IBCO
159 Burgin Parkway
Quincy, Massachusetts 02169
(617) 376-7239
ssuszczyk@nage.org

Thomas H. Geoghegan
*(Pro hac vice application forthcoming)*
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeoghegan@dsgchicago.com

Patrick V. Dahlstrom
*(Pro hac vice application forthcoming)*
Pomerantz LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
(312) 377-1181
pdahlstrom@pomlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2023, I caused a copy of the foregoing document to be served by certified mail on the Defendants at:

> Attorney General's Office
> 950 Pennsylvania Ave NW
> Washington DC 20530

Plaintiff is also attempting service of the foregoing document by electronic mail. The Complaint in this matter has been served, and proof of service will be filed once received.

> */s/ Shannon Liss-Riordan*
> Shannon Liss-Riordan