# EXHIBIT A

### Conference Call of the Federal Open Market Committee on
### August 1, 2011

A joint conference call of the Federal Open Market Committee and the Board of Governors of the Federal Reserve System was held on Tuesday, August 1, 2011, at 2:00 p.m. Those present were the following:

Ben Bernanke, Chairman
William C. Dudley, Vice Chairman
Elizabeth Duke
Charles L. Evans
Richard W. Fisher
Narayana Kocherlakota
Charles I. Plosser
Sarah Bloom Raskin
Daniel K. Tarullo
Janet L. Yellen

Christine Cumming, Jeffrey M. Lacker, Dennis P. Lockhart, and John C. Williams, Alternate Members of the Federal Open Market Committee

James Bullard and Eric Rosengren, Presidents of the Federal Reserve Banks of St. Louis and Boston, respectively

Esther L. George and Dale Roskom, First Vice Presidents, Federal Reserve Banks of Kansas City and Cleveland, respectively

William B. English, Secretary and Economist
Deborah J. Danker, Deputy Secretary
Matthew M. Luecke, Assistant Secretary
Michelle A. Smith, Assistant Secretary
Scott G. Alvarez, General Counsel
Thomas C. Baxter, Deputy General Counsel

Thomas A. Connors, Steven B. Kamin, Loretta J. Mester, David Reifschneider, Daniel G. Sullivan, David W. Wilcox, and Kei-Mu Yi, Associate Economists

Brian Sack, Manager, System Open Market Account

Jennifer J. Johnson, Secretary of the Board, Office of the Secretary, Board of Governors

Louise L. Roseman, Director, Division of Reserve Bank Operations and Payment Systems, Board of Governors

Nellie Liang, Director, Office of Financial Stability Policy and Research, Board of Governors

Robert deV. Frierson, Deputy Secretary, Office of the Secretary, Board of Governors

William Nelson, Deputy Director, Division of Monetary Affairs, Board of Governors

Linda Robertson, Assistant to the Board, Office of Board Members, Board of Governors

Seth B. Carpenter, Senior Associate Director, Division of Monetary Affairs, Board of Governors; Michael Foley and Mark Van Der Weide, Senior Associate Directors, Division of Banking Supervision and Regulation, Board of Governors; Michael P. Leahy, Senior Associate Director, Division of International Finance, Board of Governors; William Wascher, Senior Associate Director, Division of Research and Statistics, Board of Governors

Andrew T. Levin, Senior Adviser, Office of Board Members, Board of Governors

Brian J. Gross, Special Assistant to the Board, Office of Board Members, Board of Governors

Penelope A. Beattie, Assistant to the Secretary, Office of the Secretary, Board of Governors

Valerie Hinojosa and Randall A. Williams, Records Management Analysts, Division of Monetary Affairs, Board of Governors

Marie Gooding, Sarah G. Green, and Blake Prichard, First Vice Presidents, Federal Reserve Banks of Atlanta, Richmond, and Philadelphia, respectively

Jeff Fuhrer, Robert D. Hankins, Jamie J. McAndrews, and Mark S. Sniderman, Executive Vice Presidents, Federal Reserve Banks of Boston, Dallas, New York, and Cleveland, respectively

David Altig, Alan D. Barkema, Ron Feldman, Craig S. Hakkio, Stephen H. Jenkins, Spencer Krane, Julie L. Stackhouse, Geoffrey Tootell, Christopher J. Waller, and John A. Weinberg, Senior Vice Presidents, Federal Reserve Banks of Atlanta, Kansas City, Minneapolis, Kansas City, Cleveland, Chicago, St. Louis, Boston, St. Louis, and Richmond, respectively

Evan F. Koenig and Lorie K. Logan, Vice Presidents, Federal Reserve Banks of Dallas and New York, respectively

Fred Furlong and David M. Wright, Group Vice Presidents, Federal Reserve Bank of San Francisco

Joshua L. Frost, Assistant Vice President, Federal Reserve Bank of New York

### Transcript of the Federal Open Market Committee Conference Call on
### August 1, 2011

CHAIRMAN BERNANKE. Thank you, everyone, for joining us. This is a joint

FOMC–Board meeting, so I need a motion to close the meeting. Governor Duke?

MS. DUKE. So moved, because Governor Yellen is in San Francisco.

CHAIRMAN BERNANKE. Thank you very much. As you know, it's been difficult to

schedule this meeting, given the vagaries of politics and of markets. Today could have been, of

course, a high-stress day. I hope it's less stressful than that. Nevertheless, I think there are some

useful things we can do today.

Let me propose a program, and if anyone has any suggestions, please let me know. I

thought what we might do first is get some briefings. We can start, in a moment, with Linda

Robertson on the recent developments and the prospects for congressional approval. Brian Gross

is here also to provide backup on that.

Second, we'll turn to Brian Sack, who will tell us a bit about both recent and current

market developments. That's in preparation for the discussion of potential Federal Reserve

actions, if they were to become necessary. Also, I hope Brian will talk a bit about the possibility

of a downgrade. Even if there's no default, the downgrade still seems to be a large possibility,

and we'd like to know what implications that might have.

Third, Louise Roseman is here. Louise worked hard with the Treasury and with your

staffs to develop a system for handling government payments when we thought they would be

prioritized or at least not fully paid. I'm going to ask Louise to briefly tell you about that, but I

think the issue here, because this is not effective at this point, is to get from you any issues or

questions for the future that were raised by this process or any concerns you have about the system that was devised.

Then I'll turn briefly to Mike Foley to update us on banking developments and any questions we've been getting on supervisory issues.

Those are some preliminary briefings to update everybody. Questions will be allowed, of course, at any stage. After the briefings we'll turn to Bill English, who, with the assistance of Brian Sack, will discuss some of the issues raised by their joint memo of a few weeks ago about potential actions that the Federal Reserve could take. Noting that everything is not signed, sealed, and delivered and noting that there are certainly many stresses in financial markets, I think it would still be useful for us to get at least a little bit of input about what kinds of actions the Fed might consider taking under certain contingencies. Particularly given that we have no immediate action proposed, I don't plan to ask for any votes today. But again, your input is useful to help think about what we might bring to this Committee in the future.

So that's my proposal. Are there any suggestions or concerns about what else we might talk about? [No response] All right. Seeing none, let me begin our briefing process and turn to Linda Robertson to give us a brief update on yesterday's negotiations and on where it goes from here. Linda.

MS. ROBERTSON. Great. I think it's appropriate to start exactly where the President started last night. That is, although there's an agreement in principle and legislative language now embodies that framework, there are still some critical votes to take place before any of the celebration or a sigh of relief is fully realized.

I'll come back to the floor situations in a minute. Where I'd like to start is with the framework, and in particular, the mechanics of this agreement, for which there are several important milestones that I think are going to be important in terms of overall thought about where things are heading on fiscal policy. As far as the mechanics goes, I did want to take note briefly about how the various leaders were portraying this. In the document that the speaker put out last night, he basically outlined three accomplishments from his standpoint: (1) it cuts government spending more than it increases the debt limit, (2) it implements spending caps to restrain future spending,

August 1, 2011                                                              5 of 53

and (3) it advances the cause of a balanced budget amendment. Meanwhile, Majority Leader Reid put out a remarkably similar document today, but his touchstones were (1) it extended the debt ceiling up to 2013, removing the cloud of uncertainty over our economy, and (2) it makes a nearly $1 trillion down payment on deficit reductions. So that's how they're framing this deliberation today—and hopefully it will be concluded today.

Let me take a minute to explain the mechanics. It's a couple-stage process, with some interesting hallmarks; for those of you who know the budget battles of the 1980s and into the 1990s, you'll see some familiar mechanisms. For stage 1, there is an immediate-upon-passage $920 billion, roughly, deficit achievement embodied in caps on the discretionary spending accounts, and there are a couple of important components to that. In terms of the overall framework, it's split between nondefense discretionary and defense. There is a specific firewall between those two in FY2012 and FY2013 and then the firewall between those two comes down for the remainder of the 10-year period. What does this mean in terms of overall fiscal reduction in 2012 and '13? Roughly $10 billion in spending cuts over that two-year period—$7 billion and then $3 billion. Of that, $5 billion comes from defense and what they're calling security-related accounts, and the remainder from the nondefense discretionary.

With this first phase, which is automatic upon passage and is focused on the discretionary spending accounts, what happens in terms of the debt ceiling? A two-step process there. Immediately, the Treasury gets a $400 billion bump-up in the debt ceiling, which takes them into September of this year. The President then—although I don't know this for sure—would probably send a certification to the Congress, before they go out in August, attesting to certain levels of debt ceiling within their estimates for the end of the year. The Congress then has, I believe, 50 days to disapprove of that certification. And he has a veto. And with that, the President then achieves another $500 billion on the debt ceiling. In other words, the way they're thinking about this first phase is that roughly $900 billion in debt ceiling is pretty much automatic.

What happens from there? This is where we come to stage 2 and what one thinks about in terms of the overall components of this package. When you look at the totals, you've got roughly $900 billion and change in the first phase—how do you get to the roughly $2.1 trillion to $2.3 trillion that everyone's talking about? That's where stage 2 comes in. A special committee is established, which would be composed of 12 members of Congress, evenly split between parties and evenly split between the chambers. They have until Thanksgiving, November 23, to report back to the leadership on an overall deficit reduction package of $1.5 trillion. Then there's a whole set of fast-track procedures in the Congress if, indeed, this super-special committee does achieve a majority—and it's a majority vote only—on a package. The Congress then has fast-track procedures in which they can vote on this by December 23.

So what could happen with that? Well, the committee could fail, in which case a whole process is then triggered; the committee could come up with something less than the $1.5 trillion; or they could meet their goal—in fact, the Congress then subsequently passes their package. If they report $1.5 trillion and the Congress passes it, then the debt ceiling goes up by that amount as well. If they're somewhere between $1.2 trillion and $1.5 trillion, then the debt ceiling is increased to whatever level that is. If it's anything less than $1.2 trillion or they fail to do anything whatsoever, then phase 3, which is sequestration, is triggered.

Before I turn to phase 3, what's on the table in terms of this joint committee? Really, everything. It can be additional discretionary, it can be direct spending, it can be mandatory programs, it can be revenues. As I have read the summary documents today, it looks pretty much like however they want to configure it and can reach a majority vote around somewhere between $1.2 trillion and $1.5 trillion. If they fail—and this is on a very short timeline, and in an intense political environment—then an automatic sequestration process is triggered, one very much like the old Gramm–Rudman–Hollings provisions from the late 1980s and on into the '90s. But there is one other tripwire before you get to sequestration, and that is that both chambers of the Congress are required to vote on a balanced budget amendment. And by some miracle that I don't think will happen, if they were to vote and send the balanced budget amendment to the states, then none of this sequestration happens under that scenario. Highly unlikely, but nonetheless in the package.

So, sequestration. This is where everyone has mutual tension to try to avoid this outcome. That's a sequestration of roughly $1.2 trillion, 50 percent of which will come from defense and the other from nondefense spending. This package—and this is where a lot of the tension is today—is solely in the spending sphere. There are no revenues contemplated under the sequestration, solely spending accounts. So, 50 percent from defense. If that were to be triggered, they're estimating that would be about $50 billion a year in defense spending, and the remainder would be made up elsewhere. Now, there are some important safety net programs that are exempted: Social Security, Medicaid, veterans' programs, and other essential services. Medicare is included, but it's capped at 2 percent, and maybe in the range of the provider cuts. And that's it.

What does all of this mean? If you're looking at this from the perspective of those who want to protect spending programs, they have the ability in the committee process to inject any additional revenues in that process. The other thing that a lot of folks are pointing out is that all of this is scored off of the March CBO baseline, not the alternative baseline, which assumes an extension of the Bush tax cuts. In other words, we've set into motion and into law a budget framework and a spending package that has no extension of the tax cuts after 2012. So somehow, somewhere, if folks want to extend those tax cuts, they will have to create the environment and the spending and revenue tensions to do that. And that's no small amount. If you look at the current services baseline, which is what this package is scored off of, revenues go to 20.8 percent of GDP by 2021. On the other hand, with the assumption that the Bush tax cuts continue and the AMT fix is agreed, the baseline would have gone to

18.4 percent of GDP. That's a huge, huge difference, so that's a tension. Obviously, the tension of only having spending cuts sequestered in the third phase is highly problematic from some standpoint, but it's an interesting package where there are clear tensions for both sides.

So where are we? They've been in caucus meetings in their respective chambers and their respective parties since about 10:00 this morning. I heard from Senator Reid's office before we came in here that they're still expecting a vote in the Senate this afternoon. It sounds like those who are objecting to the package in the Senate are not expected to run out the clock in terms of the procedural hurdles, which is from our standpoint very important, because they could drag this out well into Wednesday if they chose to do so. So maybe a vote in the Senate this afternoon. So far, there's been speculation that the vote count is pretty strong in both caucuses. Mike Crapo was on one of the shows this morning predicting about 30 Republicans. I would think with Speaker Reid's leadership, there should be a healthy vote there. The House— it's anybody's prediction. There's a lot of work to do in the House Democratic Caucus, and I think they're still working on that.

CHAIRMAN BERNANKE. If they vote in the Senate today, would they vote in the House?

MS. ROBERTSON. They're expected to vote in the House this evening.

CHAIRMAN BERNANKE. Okay. Are there any questions for Linda? [No response] All right. I don't see any questions. We appreciate that report. It underscores that nothing's done until it's done, right?

Let me turn now to Brian Sack in New York, who will talk about some market issues and maybe, Brian, if you can, the downgrade issue as well.

MR. SACK. Sure. Thank you, Mr. Chairman. I will review some of the pressures in financial markets that had been observed as a result of investors' concerns about whether a fiscal package would be reached and the associated risks that the debt ceiling would not be raised in a timely manner. I will also describe the extent to which those pressures have unwound today in response to the announcement that the Administration and congressional leaders reached an agreement on a package.

The mood in financial markets had clearly darkened last week amid the impasse on the fiscal situation. The lack of progress toward a credible fiscal package and the uncertainty that this created about an increase in the debt ceiling weighed heavily on investor sentiment. Equity prices fell notably, with the S&P index losing about 4 percent, and the prices of other risk assets also declined. Volatility increased across a number of asset classes, with the VIX rising above 25 on Friday.

The effects on Treasury yields were more complicated. One might expect concerns about the fiscal outlook to put upward pressure on government bond yields. However, Treasury yields finished the week lower, on net, in part due to the decline in risk sentiment. The decline was also prompted by disappointing data on GDP growth, which exacerbated investors' concerns about the strength of the economic recovery. Overall, the 10-year yield declined to around 2.8 percent by the end of the week.

In addition to the effects on asset prices, investors' concerns about the debt ceiling also had detrimental consequences for the liquidity and functioning of some financial markets last week. Most notably, pressures emerged in short-term funding markets as the uncertainty about the debt ceiling persisted into the latter part of the week. Money market funds and other market participants began to hoard significant amounts of liquidity. In that process, they moved out of short-term Treasury repo transactions and Treasury bills and into deposits at financial institutions, reflecting their concern that the Treasury markets could become increasingly dysfunctional. Indeed, several major custodial banks reported substantial deposit inflows from their customers, by enough to cause them to become concerned about their leverage ratios.

For money market funds, the move to more-liquid assets largely reflected their concerns about potential redemptions by investors. Funds concentrated in Treasury assets saw the beginnings of what was feared to be a major outflow of investors, with Treasury-only money funds losing more than 8 percent of their assets over the week. Other market participants also moved into cash balances in significant size in response to the general uncertainties that they saw regarding the current market circumstances.

The heightened demand for liquidity put upward pressure on short-term interest rates. These effects were particularly pronounced for repo transactions, perhaps reflecting concerns that this market in particular would be disrupted. Indeed, the general collateral Treasury repo rate moved from around 0 basis points to about 20 basis points by the end of the week. However, a broader range of short-term interest rates were also affected. The federal funds rate moved higher over the week, although it remained well within the FOMC's target range. And the commercial paper market tightened up late last week, with most issuers being forced into very short maturities at higher rates.

Some notable distortions also emerged in the Treasury bill curve, reflecting concerns about whether debt payments will be made in a timely manner. Bills maturing in the first half of August cheapened notably, with their yields reaching about 25 basis points by the end of the week.

In response to the demands for liquidity and the uncertainties facing the market, trading conditions deteriorated in the Treasury repo market and the Treasury bill market. It became more costly to transact, and the volume of transactions fell. However, liquidity in Treasury coupon securities continued to be healthy, as evidenced in relatively steady bid–asked spreads and trading volumes.

Overall, it is clear that financial markets came under increasing strain last week. Although we never reached widespread disruption to the functioning of the Treasury market, the patterns just described suggest that market conditions had become quite vulnerable to a meaningful deterioration if the debt ceiling situation had remained unresolved.

Fortunately, we did not run that experiment. The agreement on a fiscal package that was reached yesterday will allow for a cumulative increase of more than $2 trillion in the debt ceiling in several steps, which should be sufficient to meet the Treasury's borrowing needs through late 2012. This agreement initially sparked some relief in the markets. The immediate reaction was for S&P futures to rise about 1½ percent from Friday's close and for the VIX to decline. In money markets, bill yields maturing in coming weeks fell modestly, as investors became more confident about receiving payment in a timely manner.

However, the improvement in financial markets has retraced over the course of the day today. Equity prices have pulled back, in part because of a weak reading on the ISM index, and the other movements in asset prices have either fully or partly reversed. In addition, the upward pressure on short-term funding rates has intensified this morning. The overnight repo rate for Treasury collateral has consistently traded above 25 basis points and at one point touched 40 basis points. Similarly, the federal funds rate has risen to around 20 basis points in today's trading.

This additional pressure in funding markets reflects the ongoing withdrawal of the money market funds and other market participants from the repo market and other short-term assets. Those firms that have been moving into cash in recent days have little incentive to quickly reverse that decision, especially given the lingering uncertainty about whether the fiscal agreement reached will be successfully voted into law. In these circumstances, it could take several days to see some relief in funding pressures.

This situation raises important questions about Desk operations. Under the current directive, the Desk would conduct RP operations if it believed that the federal funds rate would move above 25 basis points in the absence of such operations. We were on alert to this possibility this morning but did not act because the federal funds rate was expected to remain inside the target range. A separate but important question is whether the elevated level of RP rates itself warrants a decision by the FOMC to conduct RP operations even if the federal funds rate remains inside the target range. Bill English will discuss this policy consideration in his briefing.

I will close by noting that other important risks to the market remain, including the potential action of rating agencies, as mentioned by the Chairman. S&P had made it clear that a downgrade of the longer-term rating of U.S. sovereign debt was likely unless progress was made toward a substantial fiscal package. While the current package is sizable, it is unclear whether it is sufficient to prevent a downgrade from S&P. This looming threat of a downgrade added to investors' jitters last week, and those pressures may continue if investors see a downgrade as an ongoing risk.

It is difficult to calibrate just how much the market would react to an actual downgrade by S&P. Our judgment is that a move to a AA or AA+ rating would not force many investors to have to sell Treasury securities because of their investment mandates. It also would not necessarily affect most of the collateral arrangements that use Treasury securities. Thus, it is possible that the response would be limited, especially considering that the downgrade would be coming against the backdrop of meaningful fiscal adjustment.

However, it is also difficult to trace out all of the potential effects, leaving us fairly unsure about this judgment. More broadly, we cannot rule out the possibility that the drama of recent days could have enduring consequences for the way market participants, both here and abroad, view the quality of Treasury securities. Thank you.

CHAIRMAN BERNANKE. Thank you very much. Any questions or comments for Brian? President Fisher.

MR. FISHER. Mr. Chairman, I presume that the effect of the money market funds' activities that Brian mentioned is reflected in an increase in excess balances held by us. Is that correct, Brian?

MR. SACK. The aggregate amount of reserves in the system isn't going to change, but this is a change in the flow of those investments. So essentially, the money funds are taking money out of repo, and actually out of some bank liabilities, and increasing their holdings of deposits at other financial institutions.

MR. FISHER. Thank you.

CHAIRMAN BERNANKE. Any other questions? [No response] All right. Seeing none, let's hear very briefly from Louise. I'm interested in any feedback we might get on either the substance or the process that we worked through when we got the payment plan done. Louise.

MS. ROSEMAN. Thanks. We had put procedures in place to address how government payments would be handled if the debt ceiling wasn't increased in a timely way. Those procedures have evolved fairly substantially in the past week or two, and they weren't finalized until Friday evening or fully documented until yesterday afternoon.

Let me walk through what the current assumptions would have been. The procedures are based on three principles. The first one is that principal and interest on Treasury securities would continue to be made on time. The second one is that other payments may be delayed. The third principle is that any payments that were made would be settled as usual.

So how do you implement those three principles? With respect to the first, the principal on Treasury securities that are maturing would be funded by having auctions that would roll over those maturing securities into new issues, so the new issues would be able to fund the redemption of the maturing securities. With respect to interest payments, the way the Treasury planned to ensure that it would be able to pay interest payments timely by holding back other government payments and accumulating sufficient cash balances in its Fed account to pay upcoming coupon payments. The implication of this approach would be that the Treasury would be delaying non-P&I payments even on days when it may have ample balances in its Fed account to have been able to make those payments if it had so chosen. Instead, the Treasury would be conserving that cash to be able to ensure that it would be able to pay future-dated interest payments. Then, to ensure that payments made would settle as usual, the Treasury would not submit any ACH files to the Reserve Banks for processing unless it was certain that it would have sufficient balances on the settlement date to settle those transactions. Similarly, for checks, the Treasury would not mail checks out to the intended recipients until it was sure that it would have sufficient balances in its account to fund the presentment of those checks once they came back to the Fed. And for Fedwire funds transfers, the Treasury would not make funds transfers unless it had sufficient balances in its Fed account to do so.

So this, compared with the procedures Treasury had mapped out just several weeks ago, provides a much higher level of assurance for the banking industry that the payments they do get would be settled using normal procedures. It also provides assurance to the recipients of those payments that they would have good funds as they typically would. But it would result in delays in payments, and in particular, payments that do not relate to principal and interest. The other thing I should mention is, because the Treasury was ensuring that P&I payments would be made on schedule, it avoided a lot of very potentially disruptive effects if it missed a coupon payment or missed a scheduled redemption of maturing securities.

These, at least, are current procedures that have been codified into a special operating circular that was developed jointly by the Reserve Banks, the staff here at the Board, and at the Treasury, and has been approved by the Treasury as reflecting what it would like the Reserve Banks to do as its fiscal agents if it ever came to that.

We were positioned, in the event a deal wasn't struck, to issue this circular to the industry so it would understand what the rules of the game would be. And there were a lot of other associated customer communications that were developed, and stand ready just in case, though we no longer think we would need to use them.

So with that, let me open it up to see if there are any comments or questions.

CHAIRMAN BERNANKE.  Comments or questions for Louise?  President Lacker.

MR. LACKER.  Mr. Chairman, did you say you were interested in feedback on these processes?

CHAIRMAN BERNANKE.  Yes.

MR. LACKER.  I would remark that I received a couple of inquiries last week from banking industry participants in our District, wondering if they should do contingency planning. I advised them that they should always be doing contingency planning.  But I was hamstrung, being unable to give them more guidance to shape their planning.  And I'm sure this is something that's dawned on everyone involved in this process this time around, but more timely guidance to the banking industry is one potential opportunity for improvement.  You know, I'm not in a position to judge how that would trade off against other considerations that molded the planning in this event, but I'll just register that.

CHAIRMAN BERNANKE.  Let me respond to that.  That was a very difficult problem. Clearly, our general tendency is to want to do contingency planning well in advance and make sure everybody's well prepared, and in this case, perhaps we should have.  We'll have to think about that for the future.  In this case, though, it was certainly complicated by the fact that the Treasury's own plans kept changing, and we weren't entirely clear about what they wanted to do, which obviously was very important.  The other issue is that there was always a consideration of whether or not too much explicit attention on these issues was destabilizing rather than stabilizing.  But other than acknowledging that this was a complicated calculation, I take your point, and a number of other people have made the same general observation.

Any other questions for Louise?  Louise, on an operational basis, was there anything in this experience that we should work on going forward, either in terms of the coordination among

the Board, the Reserve Banks, and the Treasury, or in terms of the mechanics of our payment system that we should be thinking about as a broader matter?

MS. ROSEMAN.  Well, actually, the current approach requires very little change on the part of the Reserve Banks in how they would process payments because the contingency plans were based on the assumption is that by the time the payments hit the Fed, they would be processed as usual.

One of the reasons, I think, that a lot of the changes were made in the recent weeks is that it was only recently that senior policymakers, here at the Board and at the Treasury and elsewhere, paid very serious attention to what the procedures would be, and questioned, perhaps, whether that was the appropriate approach.  Planning had been under way for months, but it was only recently that there were questions raised about whether there were better approaches that would provide a higher degree of certainty to the recipients of the payments.  And I think we ended up in a better place than where we started out.

CHAIRMAN BERNANKE.  Okay.  Thank you.  President Kocherlakota.

MR. KOCHERLAKOTA.  Thank you, Mr. Chairman.  I had one quick question, which is that it seems the Treasury's planning was, as you suggested, Louise, quite fluid.  If we were in the middle of having hit the debt ceiling and the Treasury changed its mind about how it wanted to prioritize principal and interest payments, would we be in a position to accommodate that change of mind from an operational standpoint?

MS. ROSEMAN.  This is something that I know the New York Fed has been paying a lot of attention to.  You're asking, if the Treasury changed its mind again and it would not be prioritizing P&I, how would that work?

MR. KOCHERLAKOTA.  That's correct.

MS. ROSEMAN.  Actually, that would be something that the Federal Reserve would be able to implement.  The challenge is whether other market participants would be able to deal with it in their systems.  So it wasn't an issue as much of whether Reserve Bank systems would be capable of handling delayed coupon payments or delayed redemption of matured securities, but whether the other participants, the counterparties, would have similar capabilities.  And based on very limited discussions, there would be very big operational challenges and probably a lot of disruption associated with the limitations in their systems.  This is because when market participants developed their programs, they never contemplated the possibility of not having timely payments, and therefore, their systems weren't designed along those lines.

MR. SACK.  Could I emphasize that point?  The market relies on a lot of firms to provide key infrastructure.  Those firms have very complicated systems.  We're talking about the clearing banks, the Fixed Income Clearing Corporation, the dealers, and the brokers.  What we saw as the debt ceiling approached was an attempt by the industry to begin to contingency plan basically through SIFMA, but it faced a considerable challenge because it did not know the exact treatment of payments for which it was contingency planning, and, therefore, it was unable to get to a well-coordinated, very effective approach across the industry.  So I think the point that President Lacker made about the banks applies equally as strongly to this set of market participants.

MR. KOCHERLAKOTA.  Thank you.  That was very helpful.

CHAIRMAN BERNANKE.  Louise, going in the other direction, so this question was about defaulting, not prioritizing.  In the past, the Congress has excepted certain components from the debt limit where in this case there was a bill, the Toomey bill, that would have forced

the Treasury to prioritize not just principal and interest, but other major categories of spending.

Would we have been able to do that?

MS. ROSEMAN.  Well, I think the challenge would be more on the Treasury side.  What

the Treasury would have needed to do is to give us certain types of payments and not give us

other types of payments, and I know that it had concerns about its operational capability of

carrying that out.  But frankly, the Treasury had concerns about some of the approaches we've

ultimately adopted that in the past week or so that it has now decided it would be able to do after

all.  So I suspect that it would, with sufficient lead time—at least in weeks, not days—be able to

accommodate that.  But it's something that until you have developed the procedures and tested

the procedures, your comfort level is pretty low.

CHAIRMAN BERNANKE.  Thank you.  Any other questions?  [No response]  Seeing

none, Mike, would you say a few words about what we're seeing in banks and what guidance

we're giving them?

MR. FOLEY.  Yes.  Mr. Chairman, I'll start by noting that the on-site teams and
the liquidity risk specialists are in continuous discussions with the firms.  But, as
Brian mentioned, last week it was apparent that there was increasing stress in short-
term funding markets, and that resulted in increasing intensity and frequency of
discussions with the firms.  That culminated in discussions with the CFOs of a
number of the domestic firms late last week.

I think the primary message we heard back from the firms was that they're all
seeing significant inflows of deposits.  As Brian mentioned, that's related to money
market mutual funds either moving out of Treasuries or holding additional cash as
contingency, but other clients are doing the same as well.  The firms view this as a
temporary development; they anticipate similar rapid outflows once the situation is
resolved.  So from that standpoint, they view the situation as manageable.  But at least
one firm indicated that as the situation continues on or if there is a payment default,
there's potential for rapid acceleration of deposit inflows, and that could cause a
number of issues, one of which Brian alluded to.

To be more specific, I think the effects have been more apparent at the clearing
banks—JPMorgan Chase, Bank of New York Mellon, and State Street.  Again, that's
been driven primarily by money market funds moving out of Treasuries into cash.
They've seen some of that same behavior from foreign governments and corporates

as well. The effects have been most significant, again, in terms of deposits coming in. JPMorgan Chase, for example, has picked up more than $40 billion of deposits over the last week or so. That accelerated at the end of last week; on Thursday, deposits increased by $16 billion. As a result, it has been increasing its balances on deposit with the Fed. Over the course of 2011, that's typically averaged about $40 billion for JPMorgan Chase. On Thursday, that amount was up to $118 billion in terms of deposits at the Fed. So it's already been sizable. The bank gave indications that particular clients—and it mentioned one large money market fund complex—suggested that if they were concerned about potential disruption in Treasury security repayments, that they would intend to place $50 billion in deposits in a very short amount of time; it suggested another large money market mutual fund would similarly place a very large amount of funds on deposit in a short amount of time. And that was at JPMorgan Chase. In terms of the situation today, thus far it hasn't seen any significant acceleration deposit inflows. The expectation is something more along the lines of the average it saw last week—so where it is going to peak around $18 billion, it is expecting an inflow, say, in the $5 billion to $10 billion range. It's still early today, and I think the indications we saw from the other firms as well is that that's a similar expectation, if their expectations hold up.

State Street also saw very large inflows. Deposits increased about $44 billion last week. Half of that came from just two 2(a)7 funds last Tuesday, and for the remainder of the week it had more of a trickle effect, mostly from non-2(a)7 funds—close to 25 clients in total that were increasing their deposits at State Street. Again, it is investing that in the bank's fed funds account, the Fed balance, which is up by $49 billion through Friday. It is also saying that it's difficult to know what the developments will be today. It is expecting more of that trickle effect as compared with very large increases.

A similar story at BNY Mellon. It's seen significant increases. The bank's view is that the market right now is in a bit of a wait-and-see position. It is expecting at some point a significant drop-off in deposits or outflows in deposits. It is not seeing that today, and it is expecting it probably won't see that until later this week, assuming that the situation in the Congress is resolved.

In terms of the other large LISCC banks, we've seen similar trends but they are much more modest. Wells Fargo is one example where we've seen about $6 billion or $7 billion of deposit inflows. It views that as general risk aversion among their clients in contingency planning. B of A and Citi also have seen a comparatively modest increase in their deposits.

In terms of the concerns at the banks, the primary concern that we've heard—over them wanting to have some clarity in terms of discount window activity and parity of payments—is around the potential rapid increase in their balance sheet. And the most immediate effect of that would be on their Tier 1 leverage ratios and the potential that, for prompt corrective action purposes, if their Tier 1 leverage ratio fell below 5 percent, that would initiate some supervisory actions.

Our regulations do require state member banks to provide written notification in the event that they breach the well-capitalized level on an intraquarter basis. We've talked to the banks about their concerns there. We've drafted some interagency guidance that we would potentially communicate in case events continue as they are—very similar to guidance we issued around Y2K and after September 11. The intent really is to provide latitude to the firms if they remain in sound financial condition, if it's clear that the effect is only temporary, and if the firm is prudently managing the balance sheet growth—for example, placing the additional funds on deposit with the Fed.

We've been working with the OCC and the FDIC on the interagency guidance. It's clear that we're taking a consistent approach in our thinking on these issues. The OCC reached out to seven large national banks on Friday. The message was that the firms should act reasonably and responsibly, and that the OCC will not be concerned if capital ratios dip a bit—and it is talking about from 7 percent to the 6 percent range. Its view was that no large national bank was immediately in danger of breaching prompt corrective action, and that it will continue to assess the situation by staying in contact with the firms.

In terms of discussions that we have with the firms, JPMorgan Chase was one institution that may raise the potential for some constraints around prompt corrective action at the bank level. It indicated it still has about $170 billion of balance sheet capacity at the lead bank, so it has significant capacity, and much more at the holding company—closer to $700 billion—on a consolidated basis. But again, it is concerned about those very large customer deposits potentially coming in.

By our calculation, Bank of New York Mellon is probably closer to the 5 percent threshold. We spoke to the bank about that. It had been thinking primarily about the quarter-end calculation; I'm not sure it was focused on the intraquarter calculation. It is going back and recalculating along those lines, but it could be that it is very close to the 5 percent ratio, and that may trigger a notification.

Now, State Street believes it has significant room. It can absorb about another $220 billion of asset growth before it has a problem in terms of the 5 percent ratio.

CHAIRMAN BERNANKE. I think these banks probably could just finance the entire federal debt issue and solve all the problems at the same time. Thank you, Mike. Any questions, comments? Governor Duke.

MS. DUKE. Just one hypothetical question. If they were investing all of this run-up in deposits in reserves at the Fed, if our balance sheet wasn't so large, if those reserves weren't available, where might they have invested them? It seems to me that the reserves are an

attractive investment because they can be redeemed at par.  So would that be something that we might look at as a tool in the toolkit if this were to happen in a future situation where there weren't so many reserves in the system?

MR. FOLEY.  The only thing about that that I'm probably able to comment on is that it does seem like there's been almost a one-to-one relationship between the incremental deposits coming in and the increase in the Fed deposits.

MR. ENGLISH.  One thing that could happen if policy were being implemented in more or less the usual way is if people wanted reserves, they'd push up the federal funds rate, and the Desk, in responding to the higher federal funds rate, would be adding reserves, and so potentially the supply of reserves would be elastic.  Now, how elastic it would be in that situation I'm not sure, but the Desk would be aiming to keep the fed funds rate at the target level, and a high demand for reserves would lead them to add reserves.

MS. DUKE.  I guess my question, though, is if deposits are flowing in everywhere, I can see who would want to lend reserves.  I just can't see who would want to borrow those reserves.

MR. ENGLISH.  That's exactly the point.  People would want to accumulate the reserves, so the demand for reserves would be higher.

CHAIRMAN BERNANKE.  President Fisher.

MR. FISHER.  I just want to get oriented here.  I've been out of the country for a little bit, but when we last met as a Federal Open Market Committee, I think excess reserves were running around $900 billion—am I correct that they're currently running about $1.24 trillion? Does anybody, Brian or anybody else, have a sense of those numbers?

MR. ENGLISH.  Excess reserves are about $1.6 trillion, I believe, and they were at the time of the last meeting as well.

MR. FISHER.  So we haven't seen it all run into excess reserves then.  That's the point. There's not much of a change.

MR. ENGLISH.  Well, as Brian noted earlier, our operations determine the amount of reserves.  So once we completed our purchase program at the end of June, reserves were whatever they were, and since then reserves have moved around, but they have not increased.

MR. FISHER.  Thanks, Bill.

CHAIRMAN BERNANKE.  Other questions for Mike?  Mike.

MR. FOLEY.  Just one more point.  The general risk aversion and the disruption and stress in the short-term markets have also affected the foreign banking organizations.  It's been most evident at the weaker firms, the French firms in particular.  SocGen has talked about significant maturities over the course of this week and next week.  If it is unable to roll those, it may be in a position where it has to implement its contingency funding plan.  BNP indicated that a number of its counterparties were requesting buybacks of CDs over the course of the past week.  Calyon also has a very large number of maturities coming up.  So those firms are being affected—I think the core European firms to a lesser extent, but clearly these issues and the general risk aversion has affected funding for the European firms.

CHAIRMAN BERNANKE.  If there are no more questions, why don't we go on now to Bill English, who will talk about some of the prospective options in case either things worsen from here or we have a similar situation in the future.  Bill.

MR. ENGLISH.  Thank you Mr. Chairman.  With the debt ceiling impasse behind us, or at least we certainly hope so, the potential policy responses described in the memo that Brian and I sent you are not as urgently in play.  Of course, last night's deal could break down, and future debt ceiling battles could always raise similar issues.  Thus, it still seems worthwhile to have a discussion of what sorts of steps would be appropriate in such cases.  To get things started, I'll briefly summarize the possible actions that Brian and I noted in our memo.

I should emphasize at the outset that our memo focused on issues related to short-term market functioning.  Some of you noted that your policy decisions should be made in the context of our nation's longer-term fiscal challenges as well as the Committee's dual mandate, and expressed concern about the possible signaling effects of actions taken under the pressure of events.  It's clear that the Federal Reserve does not want to get entangled in fiscal policy decisions.  That said, a default triggered by a lack of congressional action to raise the debt limit would create substantial market strains that could have significant consequences for the economy.  In such circumstances, the Committee might well want to take steps to improve financial conditions and so help support economic activity.  In doing so, it would want to minimize the impression that the Federal Reserve was effectively financing government spending, with potentially adverse consequences for its inflation objective.

In our memo, we divided the possible actions that the Federal Reserve could take into four groups, and I'll follow the same approach here.  The first group included five policies that fall within the current authorization of the Desk and the authority of the Reserve Banks.  For those five, we suggested that Federal Reserve operations should treat defaulted Treasury securities in the same manner as nondefaulted securities, but with defaulted securities valued at their own market prices.  This basic approach seems appropriate so long as the default reflects a political impasse and not any underlying inability of the United States to meet its obligations, so that all payments on defaulted securities would presumably be made after a short delay and the securities remained very low risk.

In the memo, we suggested that this treatment of defaulted securities be followed in outright purchases, rollovers, securities lending, repos, and discount window lending.  And on the whole, this approach appeared acceptable to the Committee.  The Federal Reserve statement that was drafted late last week for possible use over the weekend was intended to convey that view to the public.

The second group of actions we discussed in our memo involved actions to address strains in money markets.  We suggested potential responses to two different possible situations:  Action 6 involved conducting reverse repurchase operations in response to a squeeze on the supply of Treasury bills that led to negative bill rates, negative repo rates, and impaired market functioning; and action 7 involved conducting repurchase operations in response to disruptions to the Treasury repo market that drove repo rates up meaningfully while the federal funds rate was relatively little affected.  The situation came close to that envisioned for action 6 for a time, with repo rates around zero, but over the past week, as Brian described in his briefing, the second scenario emerged; the repo rate rose to about 20 basis points on Friday and was even higher this morning.  With the funds rate up only a few basis points over the same period, a natural question is whether the repo rate has idiosyncratically diverged from the overall constellation of money market rates or whether it is a symptom of broad dislocations in money markets that could interfere with the transmission of the Committee's intended monetary policy stance.  There were signs of those wider dislocations late last week, with rates on Treasury bills and

agency discount notes up significantly and contacts reporting that conditions in the commercial paper market had also deteriorated notably. Moreover, the repo market is about $2 trillion in size, vastly larger than the federal funds market, and a significant increase in the rate on such transactions could have a substantial effect on broader financial conditions. If the Committee thought that conditions in the repo market were likely to remain strained or even deteriorate further, implying a tightening in financial conditions that would have adverse consequences for the overall economy, it could take action 7—for example, by directing the Desk to engage in repo operations sufficient to maintain the overnight Treasury general collateral repo rate in the same 0 to 25 basis point range as the federal funds rate.

The third type of policy that we noted in our memo was the possible provision of liquidity to nondepository institutions if pressures related to the debt ceiling persisted and deepened. In particular, action 8 involved providing support to money market mutual funds facing extraordinary outflows because of concerns on the part of money fund investors that some money funds might "break the buck." As Brian noted, there were substantial outflows from Treasury-only money funds last week, and efforts by money funds to bolster their liquidity contributed to the pressures in money markets. Members may feel, however, that it is critical that money funds manage their liquidity without extraordinary assistance even in difficult circumstances, and that designing a facility to provide liquidity to money funds, as suggested in the memo, without generating substantial moral hazard would be very difficult.

The Committee might nonetheless be concerned that pressures on money funds could lead them to slash their holdings of Treasury bills, pushing yields on near-dated bills to very high levels, impairing trading in the bill market, and potentially risking a Treasury bill auction failing. To help combat disorderly conditions in the bill market and foster money market rates consistent with the Committee's target range for the federal funds rate, the Committee might wish to instruct the Desk to purchase Treasury bills in that case. Such an approach could be seen as ensuring that the monetary transmission mechanism is not disrupted and thereby supporting the Federal Reserve's dual objectives. Moreover, it might involve less risk of moral hazard than attempting to establish a broad-based facility to provide liquidity to money funds.

In the fourth group of actions, Brian and I suggested that the Committee could, if it chose, engage in either outright purchases or CUSIP swaps of defaulted Treasury securities. Such operations could be warranted if the Committee determined that there was a need to increase its support of market functioning by removing defaulted securities from the market. However, such an approach could insert the Federal Reserve into a very strained political situation and could raise questions about its independence from debt management issues faced by the Treasury. The Committee could direct the Desk to purchase a specified amount of defaulted issues in the open market, as in action 9. Such purchases would not be undertaken to influence longer-term interest rates, as with LSAP purchases, but rather to address the strains in the trading of defaulted securities resulting, for example, from operational problems at the clearing banks, the Fixed Income Clearing Corporation, or the primary dealers. Of course, unless they were offset by other actions, such purchases would increase

August 1, 2011                                                    22 of 53

the size of the Federal Reserve's balance sheet and the supply of reserve balances. One way to avoid that effect, if the Committee desired to do so, would be for the Desk to instead engage in CUSIP swaps—action 10 in our memo. In a CUSIP swap, the Desk would buy a defaulted Treasury security and sell a nondefaulted Treasury security at nearly the same time, thereby removing a defaulted security from the market without increasing the size of the Federal Reserve's balance sheet.

I thought I'd end by restating the questions that we distributed on Friday. First, do you have any further questions or concerns about actions 1 to 5 in our memo, which fall within the current authorization of the Desk and the authority of the Reserve Banks?

Second, what is your view on the advisability of action 6 ("RRPs to Address Negative Treasury Bill and Repo Rates") or action 7 ("RPs to Address Pressures in the Treasury Repo Market")? I would add with respect to action 7, which may be more relevant, at what stage would you see such action as appropriate?

Third, with regard to action 8 ("Support for Money Market Funds"), do you have views on the appropriate response to extraordinary liquidity pressures on money market mutual funds, were they to occur? Here I'd be interested in your reaction also to the possibility of Treasury bill purchases by the Desk in those circumstances.

And finally, actions 9 and 10 ("Purchase Operations to Remove Defaulted Treasury Securities from the Market" and "Outright CUSIP Swaps to Remove Defaulted Treasury Securities from the Market," respectively) are designed to support market functioning. How would you balance that goal against concerns about the appropriate role of the Federal Reserve in issues related to the fiscal authorities?

Thank you. Brian, do you have anything to add before we take questions?

MR. SACK. No, nothing to add. Thanks.

MR. ENGLISH. Okay. We'd be happy to take your questions.

CHAIRMAN BERNANKE. Let's see if there are any questions, and then we'll have a quick go-round. Any questions? [No response] I do not see any questions, so let's take some views. President Kocherlakota.

MR. KOCHERLAKOTA. Thank you, Mr. Chairman. I thank Bill for his summary of his earlier memo.

As I stressed in my earlier memo to this Committee, I believe the choices that a central bank makes during periods of fiscal strain can have potentially important consequences for

August 1, 2011                                                          23 of 53

longer-term price stability.  As I see them, all of these choices are grounded in three basic

elements:  evaluation of Treasury securities when we make purchases or make loans, the

acceptability of Treasury securities as collateral, and the haircuts to be applied to Treasury

securities when they are offered as collateral.

     In terms of valuation, the English–Sack memo recommends that we use market prices as

much as possible, and I agree with this prescription.  However, I think one thing that we should

be careful about is that the prescription needs to be coupled with a quantity restriction on the

fraction of defaulted-upon Treasuries that we would hold on our balance sheet.  Otherwise, we

could be perceived, correctly or incorrectly, as actually setting the prices of those securities.

     In terms of acceptability, the memo recommends accepting defaulted-upon Treasuries as

collateral.  Now, rating agencies would typically downgrade defaulted-upon securities to D.  In

that case, our current collateral guidelines and usual private-sector practices would say that these

securities should not be acceptable as collateral.  Now, I have to say that my own view is that,

given our employment mandate and the risk to market function, we should deviate from this

standard practice and be willing to accept the defaulted-upon securities as collateral, but we need

to explain that we're willing to make such a deviation only because we expect all Treasuries to

be paid in full within a short period of time.  Without such an explanation, our willingness to

accept D-rated Treasuries could be viewed as a signal of our willingness to monetize the federal

debt and so undercut price stability.

     In terms of haircuts, the memo essentially recommends using our current practices.  I

agree with this approach, including the footnote in Chairman Bernanke's July 28 memo that we

will change our haircuts in response to sustained increases in market volatility.  I think we need

to be clear to the public about our choices about valuation, acceptability, and haircuts, but I think

even more important is that we need to be clear about why we are making these choices. In particular, our communication should explain why our choices help us achieve our fundamental objectives of maximum employment and price stability as opposed to simply talking about instrumental goals like market function.

Let me turn very briefly to the specific options that Brian and Bill offered in their memo. I'm happy with options 1 to 5. In terms of options 6 and 7, I believe we should certainly consider these if we think the relevant impairment to market function poses significant risk to employment. Option 9 involves an expansion of the balance sheet, which I would not favor simply as a way to deal with a debt ceiling issue. I see option 10 as potentially useful, but with a caveat that we can't end up holding so many defaulted-upon securities that it appears that we were setting their prices. I've been speaking as if this is a situation we are actually going to be dealing with, and of course, right now it looks like it will be only a hypothetical, which I'm thankful about.

Let me close with one final comment about communication if we do have this kind of event happen in the next day or two or in the future sometime. I think communication will be critical, and I would very much hope the Chairman would be able to give a press briefing about the policies that we're using and communicate why we're using these policies. I think the issues are subtle and the choices do matter, but I don't think we would be able to achieve the right level of communication without the Chairman's personal touch. Thank you, Mr. Chairman.

CHAIRMAN BERNANKE. Thank you. President Rosengren.

MR. ROSENGREN. Thank you, Mr. Chairman. I'm pretty comfortable with the suggested approach of the treatment of government securities in Bill and Brian's memo.

In terms of President Kocherlakota's comment on defaulted securities, discussion with asset managers in Boston seemed to indicate that there's really no prohibition on holding defaulted government securities by most asset managers, and I think we should have the same policy. I don't think it's at variance with private-market practice; I think, in fact, it's actually consistent with private-market practice.

In terms of market functioning, when temporary political dysfunctions result in a tightening of policies that affect other private-market participants, I think that is undesirable.

I would just make two other quick comments. One is that I think it is interesting to see which banks are becoming capital constrained. Another is that, as we think about SIFI surcharges and the role of some of our clearing banks, getting a better understanding of what the flow of funds to these organizations is may be useful in thinking about what kind of capital standards we might want to set for these institutions.

In terms of the role of money market funds, I think our concern right now highlights the need to be sure that we move toward getting a more stable regulatory environment for money market funds more generally. It's been a couple of years since the crisis. The SEC has been moving at a rather leisurely pace, and rather than coming up with alternative ways to deal with the money market fund problem here, I think we should be continuing to apply pressure to try to get a more stable solution, because I think right now we're in a situation where problems in the money market funds, problems with our own political dysfunction, and problems in Europe have at least the potential to triangulate in a way that is very, very undesirable. While it looks like some of the issues with the debt ceiling are going to be resolved relatively quickly, I think it does highlight that money market fund disruptions have broader impacts because of the assets they've been holding. This is occurring in an environment where they're already very rapidly reducing

their holdings of European credits, and I think, depending on what we did, we could've

potentially seriously exacerbated what's happening in Europe, and I think we want to avoid that.

So in terms of the money market funds, I'd rather be talking about a longer-run solution and less

about short-term facilities.  Thank you, Mr. Chairman.

CHAIRMAN BERNANKE.  Thank you very much.  President Williams.

MR. WILLIAMS.  Thank you, Mr. Chairman.  I view all 10 proposed actions as being

entirely consistent with the Federal Reserve's role of lender of last resort in response to market

dysfunction resulting from a failure to raise the debt ceiling.

In particular, I view actions 1 through 5 as consistent with our past practice and good

policy.  Indeed, in such circumstances, communication of this "business as usual" approach, as in

the draft statement, would send an important message that might reduce uncertainty and help

calm markets.  In principle, I would also support actions 6 through 10 in the event these market

segments showed signs of serious impairment.  Indeed, it would be useful for us to begin

discussions regarding the appropriate thresholds for taking these actions.  Specifically, under

what conditions would we implement action 7, "RPs to Address Pressures in the Treasury Repo

Market"?  My question is, would it depend on signs of spillovers from the repo market to other

markets, such as commercial paper, or obvious signs of a drying-up of liquidity in the repo

market?

I think it's very important—and I'm going to echo here some comments by President

Kocherlakota—that we clearly distinguish in our public communications between these lender-

of-last-resort policies aimed at providing liquidity and monetary policy aimed directly at

macroeconomic conditions.  To sharpen this distinction, I prefer action 10 over action 9—that is,

purchases of defaulted securities should be matched with sales of otherwise similar nondefaulted

securities so that these actions are neutral with respect to our balance sheet, and we should explain clearly that the enactment of any of these programs will not interfere with our pursuit of our mandated goals of price stability and maximum employment. That is, even if we see a large increase in our balance sheet through these programs, we have the tools to add or remove monetary accommodation as needed.

Finally, by transacting Treasury securities at market prices, I think that will protect us from the charge that we're propping up the fiscal authority through our actions. Thank you.

CHAIRMAN BERNANKE. Thank you very much. President Lockhart.

MR. LOCKHART. Thank you, Mr. Chairman. Much of what I would say has already been said. I think that the staff has laid this out well. Actions 1 through 5 are recommended, and I think they're routine. I take actions 6, 7, and 8 as sort of contingently recommended, and I agree with that. Action 8 is very similar to the AMLF that we did in 2008, so there's a precedent for that. And as I understood the memo, actions 9 and 10 are laid out as possibilities but not with an absolutely clear recommendation. Action 10, if I understand it correctly, is similar to action 3 with the requirement of appropriate pricing. So I think those are to be considered, but I don't have strong feelings at this point on those. Those are my thoughts. Thank you, Mr. Chairman.

CHAIRMAN BERNANKE. Thank you. President Plosser.

MR. PLOSSER. Thank you, Mr. Chairman. I'll try to be brief. My comments generally fall along the lines of President Kocherlakota's. I'm fairly comfortable with items 1 through 5. I think they are standard practice as long as we're using market prices for those operations. That seems mostly straightforward, as far as I'm concerned.

I think where it gets a little more difficult is in items 6, 7, 8, 9, and 10. In each of those cases, there's this presumption that the market is not functioning and needs fixing in some sense,

and I think that's where we're getting into a little more difficult territory.  I agree with President Williams that parts of this are about liquidity, being a lender of last resort, but I think that because it's the Treasury, it is particularly muddled and dangerous territory to be treading.  We have faced negative repo rates before.  I'm thinking of item 6 here, and questioning what we mean by market functioning.  In some of these areas that involve more policy choices or changes in our policy, I'd like the Desk to be a little more explicit about what they mean by market functioning and to what extent it needs repairing in some sense.  That is, do we know what the right prices might need to be for some of these items?  I think that items 6 and 7 I can live with, but we need to be very careful.

I'm particularly troubled by item 8.  I think you have two types of money market mutual funds, including ones that may be a mixture of various types of assets.  If those money market mutual funds have trouble with Treasuries and liquidity, they can always sell other types of assets.  They don't need to sell their Treasuries, so I think that that's not a problem.  But for those money market mutual funds that are all Treasuries, it may run the risk of net asset value challenges.  That's a different sort of problem, and we may have to address that in different ways.  But I'm very cautious and skeptical of item 8 because I don't know how we're going to tell.  We don't have the authority without 13(3), and we would have the difficulty of creating moral hazard problems.  So I'm deeply worried about that.

I am very uncomfortable with item 9.  That is basically accommodating—and I think it would be seen as accommodating—financing the public debt.  That's an FOMC decision and not a Desk decision.  So I think we should be very careful, and I would oppose that, unless the FOMC decided to go forward with such an operation.

Item 10 is a sterilized version of item 9. While I'm more comfortable with that than item 9, it does strike me that the reason for going to engage in some kind of swap would be if the prices weren't set on defaulted securities or we thought the prices were wrong. That strikes me as us engaging in actively managing the prices of defaulted securities relative to nondefaulted securities, and I think that could be problematic.

So with those caveats, those are my views. Thank you, Mr. Chairman.

CHAIRMAN BERNANKE. Thank you. Scott can correct me, but just to make sure I understand, on 13(3), we've lost the ability to lend to an individual firm, but we do have the ability to set up a program that is open to a broad range of borrowers. So in principle—I'm not advocating anything, I'm just saying as a matter of law—we could set up an emergency facility for all money market mutual funds. Is that right, Scott?

MR. ALVAREZ. That's right.

CHAIRMAN BERNANKE. Yes—just for your information.

MR. PLOSSER. Yes, I understand that. I like President Rosengren's suggestion that what we really need to be doing is thinking more carefully about money market mutual funds in general. But I would be careful about going down that road under the current circumstances.

CHAIRMAN BERNANKE. Okay. Thank you. President Lacker.

MR. LACKER. Thank you, Mr. Chairman. In times like this, when we're faced with a relatively novel set of circumstances that pose policy questions for us, I think it's useful to go back to some principles that can guide us. I applaud President Kocherlakota's memo on that.

For me one stands out, and that's neutrality, that we stand apart from the market determinations of the relative values of different Treasury securities, and I was really glad and

welcomed Bill English and Brian Sack's second memo in which they carefully spelled out that

that's something that they assumed in what they had proposed.

The proposed responses here turn on whether there are problems in market functioning.

With the relative frequency with which strains in market functioning or problems or dislocations

are mentioned in here, you might expect me to, again, as you've heard me do many times in the

past, question the staff on the meaning of "market dysfunction." Well, I've decided to abandon

all such attempts. I've come to the conclusion that what the staff means by "market dysfunction"

is that the price and quantity of some particular security have moved in ways that make some

market participants unhappy—perhaps very unhappy. And I'm going to act on that basis.

Brian's description is consistent with this. All he really said was that spreads would go

up, which is to say, selling would get you a price that's pretty adverse relative to the price you'd

get if you were buying. For me, that kind of description of market functioning doesn't raise any

issues of market efficiency per se. It doesn't really rationalize, on efficiency grounds,

intervention. Now, it may have significant distributional implications. For example, RP rates

going up obviously make dealers unhappy; they tend to borrow at RP rates. But obviously,

people who still have money are willing to lend in the RP market and are better off; they're

going to be happier with RP rates going up. So it doesn't seem obvious to me why we should

intervene to prevent spikes in RP rates if fed funds rates are well behaved. The issue comes up

with money market funds—fire sales, the possibility of sales at inappropriate prices. The phrase

"appropriate prices" was used in Bill English and Brian Sack's memo.

I can picture a plausible case to be made about a particular market that, for some reason,

some barrier to entry into transacting in the market creates enough market segmentation to

warrant coming to the conclusion with some analysis that prices fall below fundamentals. But

the T-bill market is the last market in the world that I think such an argument would pertain to. Virtually everyone in the world can buy T-bills. You know, I haven't seen the staff ever make a case that prices are inappropriate. I'm not quite sure what they would rely on for making such a case. And if that's true, then merely having prices change to me isn't a rationale for intervening, even if you can describe it as a problem with market functioning.

Related to this is the question of haircuts, which I think is tricky here. In the discount window discussion, the presumption is that we use market-based prices, which our current procedures do, but haircuts are also part of the terms of trade when you make a collateralized loan. Haircuts have moved in markets on Treasuries, and our procedures for establishing haircuts are based on an incredibly longer-run moving average of price volatility. They have the effect of keeping our haircuts away from, at times like this, what's happening with market haircuts, and I'd be much more comfortable with discount window policies in which haircuts were capable of mirroring market movements in haircuts the way our price and valuations appropriately mirror market changes in valuations, and that to me is a discrepancy I can't understand.

About the particular responses—outright purchases—I'm glad that Bill and Brian clarified that. But if they're going to take Treasuries in outright purchases at market-determined prices, then I'm puzzled as to why in their first memo they would say that they would expect to see a larger share of defaulted securities being offered to us than nondefaulted securities, if the prices we're taking them at are genuinely market prices. But that needn't detain us.

Rollover issues—I think the secondary market is okay; you know, direct from the Treasury is sort of a shortcut anyway. Securities lending—again, I think haircuts ought to be

more market-matching than not.  I'm okay with RPs, and again, the issue of the discount window

having to do with haircuts.

Reverse RPs and RPs, particularly number 7—substantial pressure in RP markets might

have "detrimental consequences for broader market functioning."  I can picture market-

functioning problems having to do with settlement or computer pipelines or some other thing,

but that's not what we're talking about.  We're just talking about prices changing here, and I

don't see a rationale for us intervening there.

Money market mutual funds I think should be left on their own.  I don't see a reason for

us to intervene there.  I'm tempted to say they should go to Treasury for more insurance the way

they did the last time.

Again, I agree with President Plosser about 9 and 10 in the last group.

Those are my comments, Mr. Chairman.  Thank you very much.

CHAIRMAN BERNANKE.  Thank you.  First Vice President Roskom.

MR. ROSKOM.  Thank you, Mr. Chairman.  I would echo a couple of comments already

made in some brief remarks.  First, items 1 through 5, as noted, are fine.  They seem like, as

others have commented, very practical ways forward.

I'd like to make a comment just briefly about item number 8.  Well, indeed, we do have

history establishing such a liquidity facility for money market funds.  It would seem that we

should have a quite high threshold before we would think about enacting another program under

section 13(3).  We do know how it functions.  We could stand it up quite quickly, but as

President Plosser and others have noted, there are two broad categories of money market funds,

those that are Treasury-only and others that hold more generalized instruments.  It would be

quite helpful, it would seem, if we were going to go down that path, to be seeing an advent of

stress broadly in the money market fund space as opposed to just in Treasury-only funds. In that regard, it would seem like, if that were eventuating, that would be particularly helpful if the Treasury were witnessing and were commenting on issues that concern them about Treasury-only money market funds and at the same time we had a similarly rising sense of angst from a systemic point of view about money market funds more broadly.

The last comment I would make is to echo a point made by President Kocherlakota, especially in items 6 through 10 but elsewhere in the memo as well. It would be helpful, it would seem, to consider a scale limit and to what extent our participation in taking on board defaulted securities for our own account would start to cast a hue that would be other than just normal market function and could communicate in fairly subtle ways—perhaps more subtle ways—our intent to have an effect other than to help with the easy function of markets and the diminishing of systemic risk. Thank you very much.

CHAIRMAN BERNANKE. Thank you. President Evans.

MR. EVANS. Thank you, Mr. Chairman, and thanks to everyone who contributed memos to this discussion. I found each of them to be quite useful.

Regarding the potential policy responses discussed by Bill and Brian in their memo, I do not have any concerns about actions 1 through 5. I continue to support the current authorization. As long as our actions with regard to defaulted securities incorporate current market pricing and appropriate haircuts, these policies can be consistent with sound monetary policy.

I am a little nervous about actions 6 and 7. I think we have to be very careful in describing why we would be undertaking these actions. For example, action 6 would essentially have us, as I refer to it, "lease" our SOMA Treasuries in order to alleviate negative T-bill or repo rates. I think it's vitally important that this not be confused with a shift in monetary policy that

looks like the beginning of an exit strategy. After all, that is one of the options. Similarly, action 7 would have us increase liquidity in a way that some might confuse with QE3, if we were to do something like that. I think the key point I'm making is a simple one: Although these actions might be appropriate, we would need to be exceptionally clear in our communications. It sounds obvious, but it's natural to have trouble with that. Also, because these actions would be to support market functioning beyond our normal federal funds policy instrument, I'm nervous that these actions might be perceived erroneously as another market bailout for privileged institutions. To undertake these actions, I would hope that substantial communications would convey the FOMC's belief that these actions are vitally important to continue meeting our dual-mandate responsibilities.

Regarding action 8, support for money market funds, I think the hurdle for this action should be quite high also. I agree with President Rosengren's comments that we should study this industry very carefully and think about the right way to respond. Invoking 13(3) authority shines the spotlight ever brighter on our nonstandard policy actions. I am nervous about the invocation of "inappropriate prices," which the memo indicated. I do think this is a cleaner issue for Treasuries than at any other time we've responded recently with regard to other programs. So maybe it's workable, but it is a little nerve racking. Again, I think the hurdle for this should be a judgment that our standard monetary policy responsibilities for employment and price stability justify this.

I think actions 9 and 10 also seem like a bit of a stretch. Without more discussion, expanding our balance sheet would, again, perhaps look like QE3. I'm not saying I'm opposed to that, and I'm not saying I favor it; I just think it requires discussion. CUSIP swaps may be ingenious, and we are uniquely positioned to bear those risks as the central bank, but it could

look like we're too intimately involved in funding the Treasury in that situation.  So that makes me a little nervous.  It might be okay, but we ought to discuss that.

Finally, I think in general, we need to have many more discussions to understand the myriad implications from actions like these.  We know our monetary responsibilities with regard to the dual mandate, but we don't have the same type of agreement with regard to financial stability, especially when there are conflicts with that.  So I hope that we don't have to take these actions as quickly as was contemplated by this memo and that we have the time to think about them more carefully.  Thank you, Mr. Chairman.

CHAIRMAN BERNANKE.  Thank you.  President Bullard.

MR. BULLARD.  Thank you, Mr. Chairman.  My remarks are fairly general.  I agree with President Kocherlakota's memo that a time of government default is a time when price stability is at acute risk.  Any indication that the central bank may be willing to mitigate the situation through debt monetization could ignite inflation expectations and lead to a catastrophic outcome.  Inflation expectations could be explosive in such a situation, and the crisis could be made quite a bit worse than it would otherwise be.  In effect, the explicit default by the Treasury and the U.S. government could be exacerbated by the threat of further implicit default through higher-than-expected inflation.  This could send yields to very high levels and create a very difficult situation, with some similarities to some of the countries in the European periphery.

Given this scenario, I think we would have to be extraordinarily cautious in taking any actions that could be interpreted as debt monetization.  The crisis environment would likely be one where any move by this Committee or the Desk would be scrutinized very closely.  The past several years have shown how powerful the expectations effect can be in a crisis situation.  I

think options 9 and 10 would probably feed such expectations and, therefore, that the Committee should probably stay away from these policy actions in the event of a crisis of this type.

More generally, I think the tone of the English–Sack memo assumes more orderly market functioning than might actually occur in a crisis with defaulted U.S. Treasury securities. I could imagine little or no market for defaulted securities. Even if that might seem like an extreme market response, the securities might become toxic. We certainly saw examples of this in the last go-round in 2008 and 2009. The lack of a clear price might make many of the procedures outlined in the memo somewhat problematic, as most of the discussion assumes that a clear market price exists.

Be that as it may, it now appears that the U.S. Treasury has ultimately decided to prioritize principal and interest payments even in the event of a binding debt ceiling. This would presumably eliminate the need to plan for a state of affairs in which defaulted securities are trading—or not—in the market. However, one caveat to that is that that could change in an actual crisis situation. Thank you, Mr. Chairman.

CHAIRMAN BERNANKE. Thank you, President Bullard. President Fisher.

MR. FISHER. Thank you, Mr. Chairman. I went away and came back, and I am delighted to see that, maybe for the first time despite our close personal friendship, I'm probably more in agreement with President Evans than I've ever been before. I don't know if it's a time warp of having been to Italy or a time warp of being in an almost dysfunctional place like the United States, but anyway, I don't disagree with most of what President Evans said.

As to the first five points, I have no problem there, with the slight caveat that under dire circumstances I would worry that we might be a price determiner, and I'm not fully comfortable with the assumption that competition among primary dealers would help ensure that the prices

the Desk accepts are the market values. So that's a minor concern, depending on how dire the circumstance becomes.

        With regard to proposals 6 through 10, again, I'm on Charlie's wavelength there. So much depends in proposal number 6 on the definition of "broader market functioning." President Plosser made the point that we need some clarification here. I think that's very important. But it seems to me that proposal number 6 would be sensible if, indeed, there was market disruption, once we have that well defined. As far as proposal number 7 is concerned, I don't have significant problems with that. Neither of those—6 or 7—has issues on which I am immovable. On proposal number 8, I think Eric, as usual, has given wise counsel. We need to have a longer-term solution for money market funds. I do think invoking 13(3), whether it be under the current circumstance where we have to do it industry-wide or before where we did it for individual firms, can create political pushback. I would say that it might be acceptable if we had a serious and dire liquidity situation. There is a difference between that and solvency issues. When we had a discussion about those money market mutual funds that were in dire straits due to the circumstance in Europe, we found that there were some small firms in particular that might be a tripwire for concerns in the marketplace. I think we have to be extremely careful how we navigate our way through the difference between liquidity, market dysfunction, and just bad management and bad structure on the part of the money market mutual funds. With regard to points 9 and 10, again, Bill and Brian made it clear that these were unlikely outcomes. I would be personally firmly against either one of them. To me it would be basically political dynamite. It would be QE3 in defaulted securities. Charlie made the carefully crafted statement that "item 10 is a sterilized version of item 9," and in summary, I would view both as political dynamite,

and if not political dynamite, certainly political black powder.  It's not an avenue I would wish to go down.

Finally, Mr. Chairman, going back to President Kocherlakota, who wrote a superb memo at the very beginning of this exercise in response to the first memo sent out by Bill and by Brian, I think your personal touch here in what we communicate at the right point is very important.  At some point I want to have a discussion, and I hope you'll tolerate that discussion among the principals of the FOMC, as to what you say in Jackson Hole because the last time we spoke in Jackson Hole, we set in train a policy process that had not yet been fully cleared and worked through with the entire Committee.  I think there's going to be an extraordinary amount of attention under the current circumstances and particularly given that, under the proposals we've heard that Linda so adequately summarized, we really haven't solved much of the problems other than a temporary relief on the debt ceiling and a pushout of the possible date for default.  I would like to make a mental note here and a request for you to consider that we very carefully think through what might be said because, again, you're our leader, and your personal touch here is critical.

Finally, I'd like to thank Bill and Brian for the memo and thank Bill personally for calling me abroad and walking me through this in the most thoughtful way.  Thank you, Mr. Chairman.

CHAIRMAN BERNANKE.  Thank you.  First Vice President George.

MS. GEORGE.  Thank you, Mr. Chairman.  I'll be brief, given the comments that have preceded.  We would support policy options 1 through 5, as others have noted, and agree that 6 through 10 create higher hurdles, particularly number 9.  In that regard, as others have noted,

we should most clearly distinguish between a lender-of-last-resort issue versus a policy action in support of fiscal issues. Thank you.

CHAIRMAN BERNANKE. Thank you. Vice Chairman.

VICE CHAIRMAN DUDLEY. What I'm going to do is talk a little bit about where we are today and what we need to think about going forward. First, I think we have to recognize that there is still some risk that there will be no deal, so we're not out of the woods yet. I think we need to know, one, what would happen if there wasn't a deal in terms of markets, and two, how we would respond. In other words, what's the contingency plan? I think we were a little surprised last week by how rapidly things did deteriorate, even though people in the market thought there was going to be a deal. And if there wasn't a deal, people in the market thought there was still not going to be a default, so the probability of a default as we went into the weekend was de minimis, yet there were pretty strong market consequences. If we get to a point later this week that the vote is negative in the House or Senate and there's no deal, I think things are going to fall apart pretty quickly, and we're going to have to be able to respond very, very fast. So the more we can get on the same page now, the easier it will be to respond to that eventuality. I think that's something we'll just have to do.

Now, if there's no deal, I'd think that how this would evolve would be that the Treasury would commit to pay principal and interest, and other payments would soon be delayed as the Treasury ran out of cash. The key question at that point would be whether the Treasury's commitment to pay principal and interest is a sustainable, credible commitment. You could still have default on Treasury securities in two ways, despite the Treasury's commitment. First, prioritization—in other words, putting principal and interest ahead of payments to Social Security and Medicare, to the troops, et cetera—might not prove to be sustainable. And second,

you could have a Treasury default if the Treasury auction process wasn't sustainable—in other words, if there was a failure of the Treasury auctions to allow the Treasury to roll over its maturing debt. We can't do very much about the prioritization not being sustainable politically, but I do think we can do something about the risk of the Treasury auctions failing. I think we should care about that because I think there would be huge consequences if there was a Treasury auction failure; that would, I think, precipitate a default—or certainly ratchet up the probability of a default—substantially in people's minds, and I think that would have a huge impact on financial conditions in the capital markets.

So the question is, how can we influence the outcome and lessen the risk of Treasury auction failure? Let me tell you just a little bit of what I'm worried about. We already saw last week that money market funds were building up cash and corporations were pulling money out of money market funds and converting them to cash. We could get into a dynamic where, if we really had a "no" vote this week, this whole process could ratchet up very, very dramatically. In that situation, Treasury bill rates would probably go up significantly. Volatility in the Treasury bill market would increase dramatically. And I think as a consequence of that, it would be reasonable to assume that the probability of a failure in the Treasury bill auctions would go up a lot. So the question is, could we do something to reduce the risk of that kind of negative dynamic? I think we could. We could basically make it clear that the Federal Reserve is prepared to intervene to ensure orderly money market function. Now, in terms of Brian and Bill's memo, doing RPs was part of ensuring orderly money market function. But I think it goes beyond that. It could also include the Fed's willingness to buy Treasury bills if things got really, really disorderly.

What I'm proposing here is not that we go in and start buying Treasury bills willy-nilly. What I'm proposing is more of a communication to market participants that the Federal Reserve is going to backstop the efficient function of the money markets, and that could include doing RPs and it could include doing Treasury bill purchases, but we would only do it in extremis, if we thought things were getting out of hand.

Now, in terms of some of the criticisms of the Treasury bill purchases—first of all, people say we'd be monetizing the debt. Well, that's not really true, in the sense that the debt limit would be binding, so the total amount of Treasury debt outstanding would be fixed because we'd be at the debt limit. Second, I think it's superior to a lot of other ways we could intervene because although our balance sheet would go up, as soon as the crisis had passed, the bills would run off and so it would be very rapidly self-liquidating. I think it's far superior to doing a 13(3) facility for money market mutual funds; if you think about how we would do that, we'd have to set up an SPV, and the SPV would buy Treasury bills from the money market funds. So we'd have something that was less broad and more convoluted, creating more of a moral hazard vis-à-vis the money market funds rather than something where we're just backstopping the money market more broadly.

I think if this was communicated properly and done correctly, this would be a backstop which would basically keep people playing in the market, and we wouldn't have to actually use it. We saw in the financial crisis a number of times that having credible backstops keeps people playing and keeps markets functioning. And keeping those markets functioning is key to actually avoiding very adverse equilibriums. If everyone thinks the market's going to fail, the market will fail. We are the bastion that determines whether you end up at the bad equilibrium or the good equilibrium. So communicating that, I think, would be very helpful.

If we get to the point where we're unfortunate and the House or the Senate votes "no," things are going to get worse in a hurry, and I think we have to be prepared at that time to rapidly respond either through another meeting or through a notation vote. What I would be recommending would be three things: (1) a statement that the FOMC would act as needed to maintain orderly conditions in short-term money markets; (2) a change in the directive to make it clear that maintaining orderly conditions in short-term money markets is part of the Desk's directive; and (3) some statement, probably from the Chairman, explaining what we're doing and what we're trying to accomplish, and that our interventions would be only in extremis to ensure orderly market function.

So that's what's on my mind. Now, I want to come back to Bill English's questions. I clearly support 1 to 5. Reverse RPs and RPs, 6 and 7—I'm happy to do either of those if I think it's consistent with maintaining orderly money market function. But that, to me, is the primary criterion. If we think the money markets are disorderly, what can we do to make them more orderly? If those interventions are helpful to make the markets perform in a better way, then I think we should contemplate them. I don't favor number 8. I think the 13(3) facility for money market funds is a very problematic approach, and I think having a backstop—a willingness to buy Treasury bill securities short term—would be much superior. And 9 and 10, doing the defaulted securities—well, I really hope we never get to that point, because that's going to basically mean that the Treasury has actually failed in terms of their intention to maintain payment of principal and interest. But if we got to that point, in my mind, it would be a weighing of the costs and benefits. What's the cost to the financial market function of having these defaulted securities trading in the market? How much is that going to contribute to the breakdown of the government securities market versus how much is the cost politically to be

seen as intervening in the Treasury market and buying defaulted securities?  I think it's really hard to say ex ante where that cost–benefit calculation would come out, so that's one where you have to look at the circumstances at the time.  I think it would be very hard to make up your mind today.  Thank you, Mr. Chairman.

CHAIRMAN BERNANKE.  Thank you.  President Kocherlakota, you have a two-hander?

MR. KOCHERLAKOTA.  Yes, Mr. Chairman.  I just wanted to comment briefly on the Vice Chairman's suggested policy action of buying Treasuries.  I would counsel that we do not handle that through a notation vote.  I think this would be something that we should consider as a Committee, because I do think that such an intervention would have potentially profound consequences for price stability.  Thank you, Mr. Chairman.

CHAIRMAN BERNANKE.  I think that's a fair comment.  Governor Yellen.

MS. YELLEN.  Thank you, Mr. Chairman.  I am, of course, enormously relieved that a deal to raise the debt ceiling has been reached, and I hope that it involves enough deficit reduction to avoid a downgrade.  But I agree with Bill that it's premature to sound an all-clear until both houses of the Congress have voted to approve the legislation, and I agree with him that we do need to be prepared to deal with renewed market turbulence over the next couple of days, given the potential ramifications for financial stability and the implications for the economic outlook.  In this regard, I would support Bill's suggestions to authorize the Desk to intervene to maintain orderly conditions in money markets by purchasing Treasury bills and possibly by conducting RPs to relieve substantial upward pressure on GC repo and other short-term interest rates, if that were to emerge.

Now, even if the deal does encounter problems in the Congress, I expect that actions of this type might well prove unnecessary after the Treasury finally states that they do intend to pay principal and interest on time and we have finally issued our own set of policy statements. But if the stress nevertheless escalates, I'd support interventions to alleviate pressures on money market funds that could otherwise necessitate our invocation of 13(3) to ramp up a facility to backstop them. And I think we should certainly do what we can to avoid a situation in which market concerns about the liquidity of T-bills threaten the success of an auction, in turn triggering further flight from money market funds and market disruption more broadly.

I think a statement indicating our willingness to act to preserve orderly conditions in money markets could, as Bill suggests, play a valuable role in creating a backstop, and the need for actual intervention would probably be minimal. I'd also support repo operations by the Desk to keep the GC repo rate more closely aligned with the fed funds rate if the spread was widening quite substantially and if the pressure was showing through to money market rates more broadly, especially—and probably only—if we judged that the market disruption reflected concerns pertaining to liquidity in the bill market.

Such interventions would then seem justifiable to me on normal monetary policy grounds. Now, both of these proposed actions would increase the size of the Fed's balance sheet, and that would create some risk that markets could perceive the Fed as being willing to backstop the Treasury. But the risk seems manageable to me in the current circumstances, in light of the fact that T-bills would roll off our balance sheet rapidly and the Treasury would have made clear their intention to pay scheduled principal and interest.

More generally, should we be faced with future episodes of this type where default seems to be in question, I would broadly support actions that are designed to preserve financial stability

and to foster attainment of our dual mandate.  In thinking about how to do that, actions like 9 and

10 in the memo from Bill and Brian would seem to be possible to me, but whether or not I would

endorse them would depend on the actual circumstances were this to arise.  I certainly agree,

though, with the general principle that we absolutely need to avoid actions that create serious

questions in the markets about the Fed's commitment either to an independent monetary policy

or to price stability.

      If I could switch just briefly from short-term tactics to longer-term contingency planning,

I'd say that I've come away from this episode quite concerned by what we have learned about

the vulnerability of market infrastructure in the event of an actual default.  I think our discussions

with market participants that Louise and Brian described reveal that a default might well have

had catastrophic market consequences.  Given that we could face a similar situation somewhere

down the road, I think it's important for us to think about lessons learned so that we and markets

will be better prepared if we face such a situation again.  And I completely agree with Eric and

others that we need to address the risks that money market funds pose to financial stability.

      CHAIRMAN BERNANKE.  Thank you.  Governor Duke.

      MS. DUKE.  Thank you, Mr. Chairman.  I'm fully in support of items 1 through 5.  With

respect to 6 and 7, I've said before and I'll say again here, I think we should consider expanding

the short-term money markets, including the repo markets, that are subject to our rate targets.

With the size of our balance sheet and the fact that we're paying interest on reserves, we've

actually taken over the traditional fed funds market.  Both of these scenarios contemplate rates in

other short-term funding markets moving outside of the fed funds target, so I think that actions

that are necessary to move those rates back inside the target would be appropriate and could

include the purchases of Treasury bills.

As to item number 8, I'm very uncomfortable with liquidity provisions that are a substitute for appropriate regulation on the money market funds, especially those that would continue to support the fixed-net-asset-value regime. Also, I'm not sure how much the federal guarantee contributed to stabilizing the money market funds and how much our liquidity facilities did that, but in a situation where the federal government was already in default, I can't imagine that a federal guarantee would be very useful. Again, I would agree with the Vice Chairman that it probably would make more sense to purchase T-bills than to try to come up with some sort of facility that targeted money market funds.

On numbers 9 and 10, I'm very uncomfortable. I think there's really a fine line between market-functioning concerns and reacting to the effects of fiscal policy—or lack of fiscal policy—overwhelming monetary policy. However, I could envision a situation where it was, frankly, a reaction to operational problems, where you had some participants who just plain had no capability to hold defaulted securities. I learned about three weeks after I got here never to say never, so I will not say that I oppose these, but I would go back to the high-bar caveat. Thank you, Mr. Chairman.

CHAIRMAN BERNANKE. Thank you. Governor Tarullo.

MR. TARULLO. Thank you, Mr. Chairman. I think we're at this peculiar time right now where people believe there's maybe an 80 or 85 percent chance that we're going to get by this without a default or further turmoil in markets, but, as Bill and others have pointed out, there is some residual chance that things may go awry in one house of the Congress. I think it actually makes for a difficult time to have this conversation because on the one hand, we're gripped by experiences of the past 10 days or so and by our own predispositions on policy matters. But on the other hand, the reality of it has, I think, receded to some degree, even though not completely.

My own general sense is that it's hard to make a lot of these decisions outside of a particular context, given the rules and expectations that we've projected in the period running up to the crisis itself.

If you look at Brian and Bill's checklist, I think I'm where the center of gravity is, which is that 1 to 5 are certainly fine. Items 9 to 10 seem disconcerting in some ways but perhaps shouldn't be taken off the table. Items 6 and 7 strike me as particularly contingent on the circumstances that one faces at that moment, and I find it difficult to say anything more than that.

I will say one thing, though, and that is on this issue of what rules and expectations are in place long enough before we hit the crisis, so that we're responding to a set of credible expectations that people have had rather than having them make everything up as we go along. I would say on that point that we probably need to do more—certainly for the payments system, as Louise and Betsy and a lot of other people have pointed out over the past couple of weeks—to project what our reactions and rules will be in the event of disruptions based upon a variety of sources.

I also think that once we get into these kinds of situations—and I have felt this very acutely for the past few weeks—that it was as incumbent upon us to tell Treasury what we would and would not do as it was to listen to them as to what they would and would not do. And if there comes a moment at which we are going to draw a line and say, basically, "You can't always assume that you can react and then we, in turn, will have to make the best of that," I think we might do better in contingency planning around all sides.

We all agree on the money market funds, but it's easy for us to agree because it's not up to us to do the regulating here. I would say on this point that I got a call from a sponsor of money market funds last week who was very upset because his firm over the past month, in

preparation for potential problems, had been putting themselves in a more liquid position, and he had gotten wind of the fact that another group of funds was fully intending to come to the government and say, "The financial system collapses tomorrow unless you give us liquidity assistance." So I think it reiterates the need for the kind of regulation everybody's talking about. The problem is, it's not within our province to do it. I'm afraid I can't be any more detailed than that because I think we're just not in the moment when we have to make that determination. Thank you, Mr. Chairman.

CHAIRMAN BERNANKE. Thank you. Governor Raskin.

MS. RASKIN. Thank you, Mr. Chairman. I, too, want to say I have found the internal dialectic of the conversation here very informative, as it began with the English–Sack memo. I appreciated the framework of options that they set out and then the subsequent clarification that came through after the Kocherlakota–Lacker set of memos.

I want to say that I, too, am most comfortable with options 1 through 5, although unlike what seems to be the consensus view, I did find myself puzzled and challenged with some of the operational questions that even 1 through 5 would pose. I had scratched in the margins of my memo questions like, "What does it mean for a haircut to be consistent with historical norms, when in fact there has not ever been a U.S. default of Treasuries or a significant downgrade by rating agencies?" I asked myself, operationally, how the Desk is going to decide on any particular purchase whether it's going to accept defaulted or nondefaulted securities. How would the Desk determine whether the per-dealer limit would be loosened? So those are, I know, answerable questions, but ones that I think are embedded in even options 1 through 5.

There are two takeaways for me about this episode that come from a contextual perspective. One is how market functioning is distinct from, but also interacts with, the dual

mandate, particularly in a context of fiscal stalemate. That, I think, is a generalizable description of one of the big challenges we have. The other takeaway for me is how the business-as-usual approach, which has very comforting and calming kinds of properties, really does fade into the appearance of problematic positions, such as monetizing the debt or interfering with market function or bailing out particular sectors or promoting moral hazard. I think it's something that we will probably continue to grapple with in decisions ahead.

In terms of the other options that are not 1 through 5, I think they present significant and considerable challenges, primarily on the communications side. I don't view these challenges as absolute bars, but I do think that they are significant and would require significant care in executing. Thank you.

CHAIRMAN BERNANKE. Thank you very much. Thank you, everybody. Let me make a couple of miscellaneous comments. There was a lot of support for 1 through 5, and I think that was good. I think those policies are pretty much within the realm of usual financial stability policies. It was mentioned a couple of times that some of those actions were based on our judgment that the government would eventually pay, and I didn't quite follow that. Again, if we're doing market prices, then we're basically not substituting our judgment for anyone else's assessment. And President Bullard, I think, raised the point that market prices may not be very clear, but we would presumably have some kind of auction process.

I think a point that was somewhat underemphasized is that our transmission of monetary policy is an issue here as well. So to take an example, doing repos to keep the RP rate from uncoupling from the federal funds rate, arguably there are issues there relating to transmission. There's nothing magic about the federal funds rate. It's our indicator of the stance of monetary policy, but presumably we're aiming at financial conditions more broadly. If there's a

decoupling of other short rates from the fed funds rate, I think a monetary policy–dual mandate motivation might support some of those actions.

Finally, just a word about money market mutual funds. They should not exist. Unfortunately, they do. If they exist, they should be regulated. Unfortunately, they're not adequately regulated. And as Governor Tarullo pointed out, although we can be persuasive, we can't be dispositive on this issue. If they were some kind of bank, which is probably the right way to think about them, then presumably discount window–type lending plus regulation would be the right way to deal with them. Unfortunately, we're in this no man's land, where we neither regulate them nor have an appropriate discount window arrangement. In that context and under certain circumstances, if not only were there problems in money market mutual funds, but the whole broad context of financial stability concerns were sufficiently severe that we felt we needed to take some action, buying T-bills might be a more innocuous and more market-neutral way of trying to address those problems than opening a 13(3) facility—particularly if we sterilized the purchases, which we could do through the various tools that we have. But I'd note that, in the case of money market mutual funds, we're going to be forced into the fourth-best here, because the institutional structure is not right. It doesn't conform to our models and the way we think about liquidity and lender-of-last-resort activities.

My final comment is that I agree with the majority, that the bar for the purchase of defaulted securities should be extremely high. And I can assure President Kocherlakota that we would not do that lightly. I would be interested, just intellectually—President Kocherlakota circulated a speech, I think, where he commented that refusal of a central bank to purchase defaulted government securities was a way of short-circuiting the so-called fiscal theory of the price level. I'm curious to know at some point, not today, whether that's a rigorous statement or

whether that was just very good intuition.  But I do think that buying defaulted securities would, under most circumstances, be quite worrisome.

Again, thank you.  These comments are very helpful.  They help frame a range of decisions that we could have to take or that future FOMCs may have to take, so I think this conversation was worth having.  I'd like to ask Linda—do you have a little bit of an update on the legislative situation?

MS. ROBERTSON.  I've been here, so I'm not directly watching the floor.  But I understand that the House is debating the rule for the debt ceiling.  They're expected to vote on the rule at 4:10.  Assuming that goes according to plan and the speaker decides not to pull it, they have anticipation in the cloakroom that there will be a one-hour debate on the final rule.  So it could be—

CHAIRMAN BERNANKE.  Done this evening, then?

MS. ROBERTSON.  Yes.

CHAIRMAN BERNANKE.  Very good.  Any other comments, questions, issues?

MR. SACK.  Mr. Chairman?

CHAIRMAN BERNANKE.  Yes?

MR. SACK.  Could I return to item 7 for a moment?  Many of the items that were considered today were considered in the context of contingency planning, if markets were to become disrupted or go down certain paths.  But the perspective on item 7 that you raised, and that Governor Duke raised, was perhaps that RPs should be done in response to firmness in the repo rate simply for managing financial conditions.  The issue of whether the Committee is comfortable allowing some short-term interest rates to increase sharply even if its federal funds rate target is still being met—that, I think, is a more immediate issue, in the sense that we are

seeing firmness in the repo market today.  If there were a concern that allowing the repo rate to

be elevated was detrimental to the economic mandates of the Committee, then that seems to me

to be a more immediate issue.  Now, of course, there's a decision about whether the Committee

wants to look at a constellation of broader rates in gauging the stance of its policy.  And even if

the answer were yes, I guess there is an issue about whether you think this firmness in the repo

rate is going to persist.  You could argue for not pulling the trigger immediately in order to see if

markets calm down and the repo rates return back into the range of 0 to 25.  I guess I was curious

if the Committee has decided that it isn't concerned about repo rates, if it has decided that it is

concerned about elevated repo rates but wants to allow more time to see if they come back down,

or if it wants to go ahead and lean toward some kind of an action in that direction.

CHAIRMAN BERNANKE.  Vice Chairman Dudley.

VICE CHAIRMAN DUDLEY.  This is one person's view:  I think that what we're

seeing is basically a response to the risk that the debt limit would not be raised in a timely way,

and people are getting into cash and therefore that is putting upward pressure on repo rates.

Because we hope that the bill will be passed in the next 24 hours or so, a reasonable expectation

would be that these pressures should subside over the next week or so.  I would be more inclined

to wait a little longer, to see the outcome of the legislative process and see if these rate pressures

come down.  Otherwise, I think doing it right now—let's say, tomorrow—would raise questions

about why we were doing it and what we were concerned about for something that might not last

more than a few more days.  That's my view.

CHAIRMAN BERNANKE.  Thank you for bringing that up, Brian.  I agree with the

Vice Chairman that maybe we should let that situation evolve for a few days.  If it looks to be a

persistent and troubling situation, then it would be my proposal that we ought to have another

quick call.  Is that okay with everybody?  [No response]  All right.  So let's let that situation

evolve for a few more days, and we'll see where that goes.  I assume our presumption is that it

will calm down.  If there are new adverse developments in the fiscal situation, I think we'd have

to have another call anyway.  Anything else?  [No response]  All right.  Thank you very much.

END OF MEETING