**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF** ) <br> **GOVERNMENT EMPLOYEES, INC.,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> **v.** ) <br> ) <br> **JANET YELLEN**, Secretary of Treasury, ) <br> in her official capacity, and ) <br> **JOSEPH BIDEN**, President of the United ) <br> States, in his official capacity, ) <br> ) <br> **Defendants** ) | **Civil Action No.: 1:23-cv-11001-RGS** |

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**

1.    The Plaintiff National Association of Government Employees, Inc. ("NAGE") asks that this Court declare that 31 U.S.C.§ 3101(b), also known as the Debt Ceiling Statute, is unconstitutional and in violation of the separation of powers set out in Articles I and II of the United States Constitution.

**PRELIMINARY STATEMENT**

2.    The Debt Ceiling Statute, which will be reinstated and back in effect on January 1, 2025, is unconstitutional because Congress gives no direction to the Defendant President as to what action to take upon reinstatement of the debt ceiling when the indebtedness of the United States will be well in excess of the $31.4 trillion limit. The statute effectively places the government of the United States in bankruptcy without a bankruptcy plan or procedures. Plaintiff seeks a declaratory judgment and reserves the right to seek injunctive relief prior to reinstatement of the Debt Limit Statute on January 1, 2025, because its members face the same injury in fact, *i.e.*, losses

1

to their personal savings accounts, and face the same imminent and substantial risk of delay in payment as they did at the time of the initial filing of this action on May 8, 2023.

3.     At the time of the filing of this action on May 8, 2023, the country faced a substantial risk of a catastrophic debt default, as Defendant Yellen herself repeatedly stated, and the standing of Plaintiff to bring this action on behalf of its members must be determined as of that date. Had the default, which terrified Defendant Yellen and riveted the country's attention taken place, Defendant Yellen, in conjunction with the heads of each agency of the United States government, was about to take emergency measures of delaying wages and salary due to federal employees, including all or nearly all of Plaintiff's members.

4.     In addition, thousands of Plaintiff members had already suffered concrete, individual monetary injury from the extraordinary measures taken by the Defendant Secretary on January 13, 2025, pursuant to 5 USC § 8438. The G Fund contains contributions made by Plaintiff's members toward their retirement as part of the Thrift Savings Plan. The Defendant Secretary suspended investing the amounts that Plaintiff's members had elected to invest from their paychecks into the G Fund. The current amount of Plaintiff's members' uninvested principal and losses in interest has not been reported; in 2011, however, the extraordinary measures used to cover the national debt under a similar debt ceiling crisis resulted in losses of $378.5 million in the G Fund. These were losses to the personal savings that Plaintiff's members had placed in the Thrift Savings Plan G Fund accounts, established under 5 U.S.C. 8438, which invest exclusively in federal government debt.

5.     Plaintiff's members elected to have their personal savings invested in the G Fund, which pays interest to the individual members who hold these accounts. On January 13, 2023, pursuant to 5 U.S.C. §8438(g), the Defendant Secretary of the Treasury declared a debt issuance

suspension period to avoid creating more debt to Plaintiff's members and exceeding the limit on the nation's total indebtedness. As a result, for at least four months at the time of the filing of this action, the Defendant Secretary had made no new investments on behalf of these members in new federal debt, *i.e.*, not invested any principal, and no interest was paid into their accounts.

6.   Plaintiff and its members have a concrete stake in determining whether the Debt Ceiling Statute is constitutional when 31 U.S.C. §3101(b) goes back into effect on January 1, 2025. The injury which Plaintiff alleged at the time of filing has not disappeared but will occur again, with certainty, under existing law and will be imminent or actual by the time this litigation takes an ordinary period to resolve. Plaintiff accordingly seeks a declaratory judgment that, unless and until revised by Congress to give appropriate direction, 31 USC §3101(b) should remain suspended and unenforceable indefinitely past January 1, 2025.

7.   As set forth below, the Debt Ceiling Statute both requires and denies the defendant President any authority from Congress to comply with its terms. Without any authority to do otherwise, the President must pay the bondholders, carry out the spending that Congress has previously directed, and comply with the limit of $31.4 trillion on total indebtedness. It is impossible to do all three things at once, and Congress cannot lawfully place the President in a position where the President must violate the principle of the separation of powers and take actions that only Congress can authorize. Because of the pending harm to Plaintiff's members at the time of filing and because such harm is certain to occur again under existing law as soon as the Debt Ceiling Statute goes back into effect, and the excess of total indebtedness is even greater than now, Plaintiff is entitled to declaratory relief.

## JURISDICTION, VENUE AND PARTIES

8.     This Court has jurisdiction over this complaint under 28 U.S.C. § 1331, § 2201, and 5 U.S.C. § 702 because this case presents a substantial question of federal law.

9.     This Court has the authority to issue a declaratory judgment and to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. §§ 2201 & 2202 and 5 U.S.C. §§ 705, 706(2).

10.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1), as Plaintiff maintains its principal place of business in this judicial district and represents members, and federal employees, throughout the United States, including this judicial district.

### Plaintiff

11.     Plaintiff National Association of Government Employees, Inc., is a national labor organization affiliated with the Service Employees International Union. NAGE is incorporated in Delaware, with its place of business at 159 Thomas Burgin Parkway, Quincy, MA 02169. It represents bargaining unit employees in U.S. government agencies including, but not limited to, the United States Department of the Army, the United States Department of the Air Force, the United States Department of the Navy, the Defense Commissary Agency, the Army and Air Force Exchange Service, the Defense Logistics Agency, the United States Department of Veterans Affairs, the United States Department of Transportation, the Federal Aviation Administration, the United States Environmental Protection Agency, the United States Department of the Interior, the United States Department of Commerce, and the Federal Mediation and Conciliation Service.

### Defendants

12.     Defendant Janet Yellen is the Secretary of the Treasury of the United States and, in that position, is responsible for financing the federal government's operations.

13.     Defendant Joseph Biden is the President of the United States.

4

## FACTUAL ALLEGATIONS

14.     Plaintiff NAGE is the exclusive bargaining representative of nearly 75,000 federal employees, including approximately 6,000 in Massachusetts.

15.     The members of Plaintiff NAGE work in U.S. government agencies including, but not limited to, the United States Department of the Army, the United States Department of the Air Force, the United States Department of the Navy, the Defense Commissary Agency, the Army and Air Force Exchange Service, the Defense Logistics Agency, the United States Department of Veterans Affairs, the United States Department of Transportation, the Federal Aviation Administration, the United States Environmental Protection Agency, the United States Department of the Interior, the United States Department of Commerce, and the Federal Mediation and Conciliation Service.

### The Injury in Fact to Plaintiff's Members

16.     On June 3, 2023, just a few hours before what Defendants described as "an economic and financial catastrophe" from the inability of the United States to pay its bills, the defendant President signed emergency legislation that suspended 31 U.S.C. 3101(b), known as the Debt Ceiling Statute.

17.     White House economists who advise Defendants predicted a protracted default lasting only three months would wipe out eight million jobs and cut the stock market's value in half.

18.     Just prior to the scheduled default date of June 5, 2023, Defendant Yellen directed all federal agencies to delay and hold up the payment of routine or ordinary bills.

19.     A prominent expert on the federal budget, Wendy Edelberg, the current director of the Hamilton Project at the Brookings Institute, testified before the Congress on May 17, 2023, that a likely emergency measure in the event of default would be at least a delay in the paychecks of federal employees.

20.    Such a delay in paychecks of federal employees was one of the measures that Defendant Yellen and her staff actively considered and would very likely have taken had the United States run out of cash on June 5, 2023, to pay its bills.

21.    Just a few days before, on May 31, 2023, the Secretary of the U.S. Department of Veterans Affairs, which employs thousands of Plaintiff's members, warned of such delays in the paychecks of employees of his Department.  *See* https//news.va.gov/press room/sec.va-press-conf.

22.    By letter to Congress on January 13, 2023, Defendant Yellen had already taken certain extraordinary emergency measures to postpone the date of a default by withholding payments to the individual savings accounts of Plaintiff's members.

23.    On such date, Defendant Yellen sent a letter to Congress warning of the pending default and, pursuant to 5 USC §8438 (g), declared a "debt issuance suspension period," which held up payments due to the individual Thrift Savings Plan G Fund accounts held by Plaintiff's members.

24.    As a result, thousands of Plaintiff's members who have such G Fund accounts received no interest payments and appreciation of principal on their own personal savings.

25.    By declaring a debt issuance suspension period, Defendant Yellen stopped investing the participants' savings into one-day non-marketable Treasury securities subject to the debt limit and stopped paying interest to the participants' accounts.

26.    As a result, from January 13, 2023, up to the time of the filing of this action, and at least through June 3, 2023, thousands of Plaintiff's members who are participants in the G fund did not have the benefit from any new investment or reinvestment of, or interest on, their personal savings.

27.    Under 5 USC §8438(g), such financial losses to Plaintiff's members continue

indefinitely, unless or until such issuances could be made "without causing the public debt of the United States to exceed the debt limit."

28.     At the time of the filing of the original complaint in this action on May 8, 2023, Plaintiff's members who had personal savings in G Fund accounts and suffered these financial losses had no legal remedies or other legal avenues to recover losses to their accounts and had to depend entirely on Congress raising the level of indebtedness, so that the Defendant Secretary could reimburse their financial losses.

29.     At the time of the filing of this action, and as estimated by White House economists in paragraph 17 above, Plaintiff's members enrolled in the four other federal employee thrift savings plans which do invest in non-government equity and debt would have faced the same significant losses, had default lasted up to three months.

30.     By prioritizing payment of interest on Treasury securities of persons other than the participants in the G Fund accounts, Defendants effectively defaulted on the timely payment of its obligations on Treasury securities to Plaintiff's members after January 13, 2023, notwithstanding Section 4 of the Fourteenth Amendment which states that the validity of the public debt may not be questioned.

31.     Had the United States run out of cash on June 5, 2023, and a more general default occurred, Plaintiff's members in these same G Fund accounts would have suffered even greater financial injury from default of Defendants.

32.     Plaintiff NAGE, as a labor organization, is entitled to bring this action to protect its members from unlawful and unconstitutional statutes, including the Debt Ceiling Statute, that causes or threatens them with loss or delay in salary and investments, and such action is germane to the purposes of Plaintiff as a labor organization.

**<u>Continuation of Illegal Conduct</u>**

33.     While the Debt Ceiling Statute has been suspended temporarily until January 1, 2025, there has been no voluntary cessation and no statement by Defendants disclaiming further enforcement or reinstatement on January 1, 2025.

34.     Defendant President himself has expressed doubt that the Debt Ceiling Statute is constitutional.

35.     Yet Defendants plan to continue its enforcement and have indicated, as things stand, that they will comply with the Debt Ceiling Statute when it is reinstated on January 1, 2025.

36.     Under Public Law 118-5, which took effect on June 3, 2023, there will be at least a modest increase in spending.

37.     As a result, the total indebtedness of the United States will have increased even further above $31.4 trillion when the Debt Ceiling Statute goes back in effect on January 1, 2025.

38.     Furthermore, apart from spending increase in Public Law 118-5, the prior debt impasse of recent weeks will likely increase cost of government borrowing as the date of January 1, 2025, approaches, so that the level of public indebtedness will be higher still.

39.     At present, there has been no cessation, voluntary or otherwise, or change of law, that would stop the use of the same Debt Ceiling Statute, as of January 1, 2025, from inflicting the same objective harm or risk of harm that existed on May 8, 2023, when this action was filed.

40.     Rather than the risk of harm as alleged in the original complaint being merely "capable of repetition," it is the same harm or risk of harm being continued in an even greater and more dangerous form.

41.      As set out above, the total indebtedness of the United States over $31.4 trillion will be even greater when the Debt Ceiling Statute goes back in effect.

42.     As a result, the amount of cancelled spending and default on public debt that will be forced upon the country at that time will be even greater.

43.     It is an ominous sign that the current Congress was neither able to enact an increase debt ceiling or reduce the current level of public spending, and the political compromise reached makes default a certainty on January 1, 2025.

44.     Absent a change in law, and under existing law, Plaintiff's members face certain and irreparable harm as of January 1, 2025, just eighteen months away, and well before that date, another declaration of a debt issuance suspension period causing financial loss to the Plaintiff's members.

## <u>Constitutional Violations</u>

45.     As of January 1, 2025, upon reinstatement of the Debt Ceiling Statute, Congress will in effect impose a bankruptcy without a bankruptcy type procedure and without any direction as to what actions that the Defendants are to take to comply with its terms.

46.     Any such action by Defendants would be unlawful because every such action requires would be of such enormity as to require the clear authorization of Congress, which the Debt Limit Statute has failed to provide.

47.     The Debt Ceiling Statute by its silence requires the Defendant President to do three impossible things at once, namely, to pay the bondholders, to carry out the spending Congress has directed, and to comply with the denial of any authority of the Secretary to borrow.

48.     The silence of the Debt Ceiling Statute has thereby placed the Defendant President in an impossible position without any clear authorization from Congress as to what, if any, course of action that Defendants may lawfully pursue.

49.     Under Article II of the Constitution, the Defendant President is obligated to execute

all the laws without exception and may not take these major decisions to renege on the debt or cancel spending on his own without authorization by Congress.

50.     Nor could Congress authorize the President to default on the debt, as it has no specific or express power to do so under Article I, or to cause bankruptcy, rather than use its power to tax or borrow to meet the obligations which Congress itself incurred.

51.     The silence of Article I as to any such extraordinary power to cause a bankruptcy rather than use the express power to tax or borrow is an effective prohibition.

52.     Furthermore, it is inconsistent with the express intent of the Framers to create a form of government unlike the Articles of Confederation that had the power to tax and borrow so as not to default on its debts.

53.      Furthermore, the inference of any such power would conflict not only with Article I but with Section 4 of the Fourteenth Amendment, which states that the validity of the federal government's public debt may not be questioned.

54.     Any such inference of a power by Congress to default on debt would also be inconsistent with Article I, section 10, cl. 1, prohibiting the states from impairing the obligation of contracts.

55.     Under the canon of constitutional avoidance, and for the other reasons set out above, the Debt Ceiling Statute may not be interpreted to authorize Defendants to default on the principal or interest of the outstanding federal debt.

56.     Nor does the Debt Ceiling Statute authorize Defendants to cancel any spending that Congress has previously directed to comply with its terms.

57.     Even if it did so, Congress cannot grant any power to the Defendant President to cancel spending directed by law, unless Congress itself does so through the detailed legislative

process set out in Article I, section 7.

58.     Nor does the Defendant President have any such power under the Impoundment Control Act of 1974, 2 U.S.C. § 681 *et seq.*, which does not permit the recission of funds unless Congress approves such action within 45 days.

59.     In the case of the Anti-Deficiency Act, which is applicable in the absence of a duly enacted budget, yet to be determined, the President has limited authority to continue essential operations until the Congress has exercised its constitutional function of approving a budget and provides appropriate guidance to the President as to how to proceed.

60.     However, in complying with the Anti-Deficiency Act, the President does not have the authority to suspend or cancel any laws or any programs that are, in fact, funded by Congress. By contrast, the Debt Limit Statute has a retroactive effect and requires a reduction of operations of government approved by Congress, with no legislative direction as to which obligations to cancel.

## FIRST CAUSE OF ACTION:

### VIOLATION OF THE SEPARATION OF POWERS AND PRESENTMENT CLAUSE UNDER ARTICLES I AND II TO THE UNITED STATES CONSTITUTION

61.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     Pursuant to 28 U.S.C. §2201, Plaintiff seeks a declaratory judgment that for the reasons set out above, the Debt Ceiling Statute unless and until revised properly by Congress is unconstitutional in its current form  because any actions that the Defendant President and Secretary might take to comply with its limit once the United States no longer has enough cash to pay its expenses would require clear authorization from Congress, which the Debt Ceiling Statute utterly fails to provide.

63.     Specifically, Congress has conferred no authority on the President to forego payment of the principal and interest on the public debt, or to cancel spending directed by Congress, to comply with the limit set by the Debt Ceiling Statute and has failed to provide any schedule of payments of any kind for Defendants to follow.

64.     Apart from the silence of the Debt Ceiling Statute as to actions the Defendants make take, it is in doubt whether Congress has the authority under Article I to forego payment of principal and interest on the federal debt, or in effect declare a form of bankruptcy for doing so, when Article I is silent as to such authority and Section 4 of the Fourteenth Amendment states that the validity of the public debt may not be questioned.

65.     Likewise, because here too the Debt Ceiling Statute is silent, Congress has conferred no authority on the Defendants to cancel any spending that Congress has directed.

66.     Apart from this silence of the Debt Ceiling Statute, Congress cannot constitutionally grant the power to the defendant President to cancel any spending directed by Congress by law, unless Congress itself amends or repeals such law through the prescribed legislative procedure set out in Article I, section 7.

67.     Accordingly, Plaintiff seeks a declaratory judgment that the Debt Ceiling Statute, 31 U.S.C. § 3101(b), in its current form, is unconstitutional unless and until it is revised by Congress to determine which specific spending approved by Congress should be rescinded immediately as a matter of law to comply with the limit on indebtedness and the Defendant Secretary's authority to borrow.

68.     Unless and until Congress revises the Debt Ceiling Statute to clearly authorize what actions that the Defendants shall take to comply with its terms in a manner that is consistent with the separation of powers in Articles I and II as well as the Fourteenth Amendment, this Court

should declare that the now suspended Debt Ceiling Statute may not be lawfully reinstated.

69.     Plaintiff reserves the right to seek injunctive relief as appropriate as the date of reinstatement of the Debt Ceiling Statute draws near, and as Defendants again must take emergency cash management methods in advance of the pending default.

## SECOND CAUSE OF ACTION:
### VIOLATION OF THE FIFTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     Under the facts set forth above, and in violation of the principles of equal protection and due process as incorporated into the Fifth Amendment of the Constitution, Congress has no scheme or set of classifications to determine or control which persons, corporations, or associations will or will not forfeit or lose amounts or suffer a taking of property and contractual rights due to them under 31 U.S.C. § 3101(b), or when the limit on the total indebtedness of the United States is reached, and the taking of such property or contractual rights or infliction of financial loss without the sanction of any law or consent of Congress deprives Plaintiff's members who are participants in the G Fund accounts of their property without due process of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court to:

A.     Declare and enter judgment pursuant to 28 U.S.C. §2201 that the Debt Ceiling Statute in its current form is unconstitutional in that 31 U.S.C. §3101(b) at present requires the Defendant President and Secretary to take actions for which such Defendants have no authority to take under the Debt Ceiling Statute and that require clear authorization by Congress;

B.      Declare and enter judgment pursuant to 28 U.S.C. 2201 that Congress has not con-

ferred any authority in the Debt Ceiling Statute to default or impair any obligations to holders of

federal debt, and Congress could not confer such authority on Defendants under Article I or under

the Fourteenth Amendment even if it chose to do so;

C.      Declare and enter judgment pursuant to 28 USC 2201 that Congress has not con-

ferred any authority in the Debt Ceiling Statute to cancel or rescind any spending directed previ-

ously directed by Congress, and Congress could not confer such authority on Defendants under

Article I, even if it chose to do so;

D.      Declare that because of the constitutional infirmity declared by this Court, the Debt

Ceiling Statute may not lawfully be reinstated on January 1, 2025, unless and until it is revised by

Congress in a manner consistent with Articles I and II, and the Fourteenth Amendment;

E.       Grant such other relief, including injunctive relief, as may be appropriate to bar the

reinstatement of the Debt Ceiling Statute on January 1, 2025; and

F.      Grant such and other further relief as the Court deems just and proper.


Dated: June 20, 2023

                                        Respectfully submitted,

                                        NATIONAL ASSOCIATION OF
                                        GOVERNMENT EMPLOYEES, INC.,

                                        By its attorneys,

                                        */s/ Shannon Liss-Riordan*
                                        Shannon Liss-Riordan, BBO #640716
                                        Matthew P. Carrieri BBO #705192
                                        Lichten & Liss-Riordan, P.C.
                                        729 Boylston Street, Suite 2000
                                        Boston, MA 02116
                                        (617) 994-5800

sliss@llrlaw.com
mcarrieri@llrlaw.com


Sarah E. Suszczyk
*(pro hac vice)*
General Counsel
NAGE/IBPO/IAEP/IBCO
159 Burgin Parkway
Quincy, Massachusetts 02169
(617) 376-7239
ssuszczyk@nage.org


Thomas H. Geoghegan
*(pro hac vice)*
Despres, Schwartz & Geoghegan, Ltd.
77 West Washington Street, Suite 711
Chicago, Illinois 60602
(312) 372-2511
tgeoghegan@dsgchicago.com


Patrick V. Dahlstrom
*(pro hac vice)*
Pomerantz LLP
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
(312) 377-1181
pdahlstrom@pomlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was served by electronic filing on June 20, 2023, on counsel for Defendants.

*/s/ Shannon Liss-Riordan*
Shannon Liss-Riordan